### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUSTEES of the IAM NATIONAL PENSION FUND**, <br><br> *Plaintiffs,* <br><br> **v.** <br><br> **M & K EMPLOYEE SOLUTIONS, LLC**, *et al.,* <br><br> *Defendants.* | **Case No. 1:20-cv-433-RCL** |

## <u>MEMORANDUM OPINION</u>

This case began when M&K Employee Solutions, LLC – Alsip ("M&K ES Alsip") refused to pay withdrawal liability to the Trustees of the IAM National Pension Fund (the "Trustees") in defiance of the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"). M&K ES Alsip is part of a network of interrelated legal entities operating truck dealerships in the midwestern United States (collectively, "M&K"). Several of these entities are named as codefendants in this suit alongside M&K ES Alsip. The Trustees allege that these entities are jointly and severally liable for unpaid withdrawal liability, delinquent contributions, accrued interest, and liquidated damages. On not one, but two occasions, the Court preliminarily enjoined defendants to pay withdrawal liability to the Trustees. Both times, defendants defied the Court's orders and refused to pay. Eventually, defendants paid an amount of money to the Trustees and moved for partial summary judgment. The Court denied that motion. Now, the Court must decide the Trustees' motion for summary judgment and the defendants' cross-motions. The Trustees seek judgment in their favor on their various claims. The defendants seek summary judgment that they are not liable

for delinquent contributions and that the methodologies for calculating unpaid withdrawal liability and accrued interest should be construed in their favor.

Before the Court reaches the parties' motions for summary judgment, it will address two other pending motions. Defendants seek leave to amend their responses to the plaintiffs' fourth set of requests for admissions. The Court will **GRANT** this motion. Defendants also ask the Court to clarify or reconsider its earlier opinion denying the defendants' motion for partial summary judgment. The Court will **DENY** this motion. As for the summary judgment motions, the Court concludes, based on applicable law and the undisputed factual record, that the M&K entities constituted a functionally integrated enterprise and that the defendant entities named in this suit are jointly and severally liable for unpaid withdrawal liability, delinquent contributions, accrued interest, and liquidated damages. Accordingly, the Court will **DENY** the defendants' motions for summary judgment. The Court will **GRANT** the Trustees' motion for summary judgment.

## I.    BACKGROUND

The Court's previous Memorandum Opinions explained much of the background of this case. *See Trs. of the IAM Nat'l Pension Fund v. M & K Empl. Solutions, LLC*, No. 20-cv-433 (RCL), 2021 WL 1546947, at *1–3 (D.D.C. Apr. 20, 2021) ("*IAM I*"); *Trs. of the IAM Nat'l Pension Fund v. M & K Empl. Solutions, LLC*, No. 20-cv-433 (RCL), 2022 WL 594539, at *1–5 (D.D.C. Feb. 28, 2022) ("*IAM II*"); *Trs. of the IAM Nat'l Pension Fund v. M & K Empl. Solutions, LLC*, No. 21-cv-2152 (RCL), 2022 WL 4534998, at *1–5 (D.D.C. Sept. 28, 2022) ("*Arbitration Decision*"). Nevertheless, given the significant time that has passed since the Court's most recent decision, and the more detailed record required on summary judgment, the Court will explain afresh the factual and procedural history of the ongoing legal contest between the Trustees and the M&K defendants.

The Court will first discuss ERISA, withdrawal liability, and the "pay now, dispute later" rule. The Court will then recount the factual history of this case, including: (1) the characteristics of the IAM National Pension Fund; (2) the legal structure of the M&K Employee Solutions and M&K Quality Truck Sales entities; (3) the M&K Employee Solutions entities' obligations under collective bargaining agreements; (4) the operational structure of the M&K Employee Solutions and M&K Quality Truck Sales entities; (5) the creation of M&K Employee Solutions, LLC – Northern Illinois; (6) Chad and Jodi Boucher's home flipping operation; (7) the termination of the M&K Employee Solutions entities' collective bargaining agreements; (8) employee transfers from the M&K Employee Solutions entities to M&K Employee Services, Inc., and Laborforce, Inc.; (9) the Fund's withdrawal liability assessments; and (10) events occurring during the course of this litigation. The Court will then recount the case's procedural history and describe the motions presently before the Court.

## A. ERISA, Withdrawal Liability, and "Pay Now, Dispute Later"

Congress enacted the MPPAA, codified at 29 U.S.C. §§ 1381–1461, to "protect the financial solvency of multiemployer pension plans." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196 (1997). The MPPAA, which amended the Employee Retirement Income Security Act ("ERISA"), commands employers who withdraw from underfunded multiemployer pension plans to pay "withdrawal liability." *Id.* at 195. "Withdrawal liability" comprises an employer's share of a multiemployer pension plan's unfunded, unvested benefits. 29 U.S.C. § 1381(b)(1).

The MPPAA calls upon a plan's trustees, not the employer, to propose the amount of withdrawal liability and orders the trustees to set a payment schedule. *Bay Area Laundry*, 522 U.S. at 197 (citing 29 U.S.C. § 1399(b)(1)). Of course, an employer is not completely bound by the

amount of withdrawal liability assessed by a plan's trustees. It may timely initiate a dispute resolution procedure, first by requesting review from the trustees and later by pursuing arbitration. *See* 29 U.S.C. §§ 1399(b)(2), 1401(a)(1). Importantly, however, initiating a dispute of the amount of withdrawal liability or the payment plan does not relieve the employer of the duty to pay. "Even if the employer challenges the trustees' withdrawal liability determination . . . it must still pay according to the trustees' schedule in the interim." *Bay Area Laundry*, 522 U.S. at 197 (emphasis added). This statutory requirement is colloquially referred to as the "pay now, dispute later" rule:

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand *notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.*

29 U.S.C. § 1399(c)(2) (emphasis added); *see also Bay Area Laundry*, 522 U.S. at 197.

The "pay now, dispute later" rule is crucial to the survival of multiemployer pension funds. It "mitigates the risk that a multiemployer plan will collapse when an employer withdraws and contests the amount of withdrawal liability assessed." *IAM I*, 2021 WL 1546947, at *8. Congress knew that without such a rule, the "purpose of MPPAA would be undermined" because "employers could postpone their debts to pension funds by engaging in protracted litigation over withdrawal liability." *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 139 (3d Cir. 1997). The rule also alleviates the risk that "during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 742 (6th Cir. 2013).

To further emphasize the importance of the "pay now, dispute later" rule, Congress authorized multiple remedies for a plan when an employer violates the rule. A plan may "invoke a statutory acceleration provision" to demand all the unpaid withdrawal liability at once; it may sue to collect the withdrawal liability; and it may seek liquidated damages, attorneys' fees, and

other costs. *Bay Area Laundry*, 522 U.S. at 197; *see* 29 U.S.C. §§ 1399(c)(5), 1451(a)(1), (b), (e). Liquidated damages are something an employer "must pay as a penalty for refusing to follow the statutory procedure for challenging assessments of withdrawal liability." *Cent. States, Se. & Sw. Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1347 (7th Cir. 1992). "Liability for liquidated damages is separate from the underlying withdrawal liability itself." *Id.*

## B. Factual History

### 1. IAM National Pension Fund

The IAM National Pension Fund (the "Fund") is a multiemployer pension plan with assets held in a labor-management trust fund maintained under collective bargaining agreements. Pls.' Statement of Undisputed Material Facts ("PSUMF"), ECF No. 160 ¶¶ 1–2; Defs.' Resp. to PSUMF ("DPSUMF"), ECF No. 170 ¶¶ 1–2.[1] The Fund is administrated pursuant to a trust agreement (the "Trust Agreement"). PSUMF ¶ 3; DPSUMF ¶ 3. The Trustees are fiduciaries of the Fund. PSUMF ¶ 4; DPSUMF ¶ 4. The Trust Agreement contains a provision permitting the Trustees to "establish such procedures, rules, and regulations which they deem appropriate to effectuate the purposes of" the Trust Agreement. Trust Agreement, Creigh Decl., Ex. 2 to Pls.' MSJ, ECF No. 160-3 at 18.[2] The Trust Agreement also contains a provision regarding retroactive amendment by the Trustees:

> This Restated Trust Agreement may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees. As to any amendment, the Trustees in their discretion shall have full power to fix the effective

---

[1] The Court, as a matter of course, will cite first to the Trustees' statements of undisputed material facts, and then to the defendants' responses. If the defendants' statements of undisputed material facts are additively helpful or an undisputed factual proposition does not appear in the Trustees' statements or the defendants' responses, the Court will either add a citation to the defendants' statements of material facts, or cite to the defendants' statements in lieu of citing to the Trustees'. If the Court states a factual proposition and cites to a particular statement of fact that one of the parties has labeled as "disputed," it is because the Court has carefully reviewed the record and determined that the factual proposition stated by the Court is not in fact disputed. In some instances, the Court will discuss the relevant record evidence explicitly, or cite to it directly in lieu of citing to the parties' statements and responses.

[2] The Court will cite to ECF page numbers, not internal document page numbers or transcript lines.

date thereof. Any amendment may have retroactive effect if it is so
determined by the Trustees.

*Id.* at 33.

Employers contribute to the Fund pursuant to collective bargaining agreements.
Contributions not paid "on or before the last business day of the month in which the contributions
are due" are delinquent under the policy adopted by the Trustees for collecting delinquent
contributions (the "Contributions Policy"). Contributions Policy, Creigh Decl., Ex. 3 to Pls.' MSJ,
ECF No. 160-4 at 3; *see also* PSUMF ¶¶ 7–9; DPSUMF ¶¶ 7–9. Under the Trust Agreement,
employers owe interest on delinquent contributions at the rate of 1.5% per month "from the date
of the delinquency until the due date payment is received." Trust Agreement at 22. Amounts paid
for delinquent contributions are "credited first toward payment of the delinquent [c]ontributions,"
then "towards the outstanding interest accrued[, ]and then towards any liquidated damages."
Contributions Policy at 3.

As of the end of 2016, the present value of the vested benefits owed under the Fund
exceeded the actuarial value of its assets. Actuarial Valuation Report as of January 1, 2017, Creigh
Decl., Ex. 4 to Pls.' MSJ, ECF No. 160-5 at 4; *see also* PSUMF ¶ 12; DPSUMF ¶ 12. This
underfunding entitled the Fund to pursue withdrawal liability from any employers that thereafter
effectuated "a complete[ or] partial withdrawal" from the Fund. 29 U.S.C. § 1381(a).

On December 5, 2018, the Trustees adopted a policy for assessing withdrawal liability (the
"Withdrawal Liability Policy"). Withdrawal Liability Policy, Creigh Decl., Ex. 6 to Pls.' MSJ,
ECF No. 160-7 at 2. Under the Withdrawal Liability Policy, the Trustees may declare an employer
in default if, in their discretion, they determine that "there is a substantial likelihood that the
employer will be unable to pay its withdrawal liability," or the employer "failed to pay [a] past
due installment within 60 days" of receiving "the late payment notice." *Id.* at 4–5. Under the

Second Amendment to the Withdrawal Liability Policy, which the Trustees adopted on April 7, 2021, interest "will be charged on any amount in default from the date the payment was due to the date it is paid at a fixed rate of 1.5% per month." *Id.* at 11.

In contrast to the Contributions Policy, the Trust Agreement and the Withdrawal Liability Policy do not "address whether payments received after an employer is declared in default should first be credited toward the principal amount of the outstanding withdrawal liability" or to "accrued interest on the unpaid principal." PSUMF ¶ 17; DPSUMF ¶ 17.

### 2.  M&K Employee Solutions and M&K Quality Truck Sales

M&K Truck Centers is a trade name for a family of commercial truck dealerships. PSUMF ¶¶ 33, 43; DPSUMF ¶¶ 33, 43. M&K Truck Centers sell trucks and trailers and provide various truck-related services including financing, maintenance, and repairs. PSUMF ¶ 34; DPSUMF ¶ 34. M&K Truck Centers' website states that it "employs over 1,000 people in twenty-eight locations in five states and is headquartered" in Michigan. PSUMF ¶ 35; DPSUMF ¶ 35. Each dealership operates as a separate entity but is "owned directly or indirectly" by Ronald J. Meyering ("Meyering"). PSUMF ¶ 37; DPSUMF ¶ 37.

Four M&K Truck Centers are relevant to this litigation: M&K Quality Truck Sales of Alsip, LLC ("M&K Sales Alsip"), M&K Quality Truck Sales of Joliet, LLC ("M&K Sales Joliet"), M&K Quality Truck Sales of Summit, LLC ("M&K Sales Summit"), and M&K Quality Truck Sales of Northern Illinois, LLC ("M&K Sales Northern Illinois"). Each of these dealerships are registered at the same address in Byron Center, Michigan, which serves as M&K Truck Centers' headquarters. PSUMF ¶ 38; DPSUMF ¶ 38; *see also* M&K Truck Centers Corporate Brochure, Shah Decl., Ex. 9 to Pls.' MSJ, ECF No. 160-28 at 2; M&K Sales's Answer to Fifth Amended Complaint, Shah Decl., Ex. 13 to Pls.' MSJ, ECF No. 160-32 at 20. M&K Sales Alsip, M&K Sales

Joliet, and M&K Sales Summit were organized in 2012 after Meyering acquired the "assets and operations" of two dealerships located near Chicago. Defs.' Statement of Undisputed Material Facts ("DSUMF"), ECF No. 161-2 ¶¶ 1, 7; Pls.' Resp. to DSUMF ("PDSUMF"), ECF No. 164-1 ¶¶ 1, 7. M&K Sales Northern Illinois was established in 2013. PSUMF ¶ 40; DPSUMF ¶ 40. The Court will refer to these four entities collectively as "M&K Sales."[3]

The M&K Sales entities do not formally employ anyone. PSUMF ¶ 52; DPSUMF ¶ 52. Instead, they lease their employees from leasing companies owned by *de facto* officers of M&K Sales.[4] PSUMF ¶ 53; DPSUMF ¶ 53. Six employee leasing companies owned by M&K Sales officers are relevant to this litigation: M&K ES Alsip, M&K Employee Solutions, LLC – Joliet ("M&K ES Joliet"), M&K Employee Solutions, LLC – Summit ("M&K ES Summit"), M&K Employee Solutions, LLC – Northern Illinois ("M&K ES Northern Illinois"), M&K ESI, and Laborforce. The court will refer to the four M&K Employee Solutions entities collectively as "M&K ES."[5]

The M&K ES entities hired employees, which the M&K Sales entities leased from M&K ES from October 1, 2012, until December 31, 2018. PSUMF ¶ 121; DPSUMF ¶ 121. On January

---

[3] M&K Quality Truck Sales of Illinois, Inc. ("M&K Illinois") owns 100% of M&K Sales Alsip, M&K Sales Joliet, and M&K Sales Summit. PSUMF ¶¶ 41–42; DPSUMF ¶¶ 41–42. It owns 99% of M&K Sales Northern Illinois. PSUMF ¶¶ 41–42; DPSUMF ¶¶ 41–42.

[4] Meyering, Ted Pilecki ("Pilecki"), Chad Boucher ("Boucher"), and Rainelle Jansma ("Jansma"), all of whom currently serve as *de facto* officers for M&K Sales, are employees of M&K Employee Services, Inc. ("M&K ESI"), leased to M&K Sales. *See* PSUMF ¶¶ 44–47; DPSUMF ¶¶ 44–47. They were previously employed by M&K Sales directly. DSUMF ¶¶ 1–2; PDSUMF ¶¶ 1–2. As discussed below, Jansma formed the various M&K Employee Solutions entities and owned them until 2014, when she sold them to Boucher. PSUMF ¶¶ 80–81; DPSUMF ¶¶ 80–81. Jansma owns Laborforce, Inc. ("Laborforce"). PSUMF ¶ 123; DPSUMF ¶ 123. M&K ESI is owned by a corporation owned by Pilecki, Boucher, and trusts created for Meyering's children. PSUMF ¶ 136; DPSUMF ¶ 136. Jansma reports to Boucher, and Boucher and Pilecki report to Meyering. PSUMF ¶ 48; DPSUMF ¶ 48.

[5] M&K Employee Solutions, LLC ("M&K ES Main") is a Series Limited Liability Company formed under Illinois law; each of the individual M&K ES entities are "Series" LLCs. DSUMF ¶¶ 8–9, 23–24; PDSUMF ¶¶ 8–9, 23–24.

1, 2019, M&K Sales stop leasing employees from M&K ES and began leasing employees from M&K ESI and Laborforce. PSUMF ¶ 122; DPSUMF ¶ 122.

### 3. M&K ES's Obligations Under the Collective Bargaining Agreements

Three of the of the four M&K ES entities were parties to collective bargaining agreements (the "CBAs") with the Automobile Mechanics' Local No. 701, International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union"). PSUMF ¶ 62; DPSUMF ¶ 62; DSUMF ¶ 16.[6] The CBAs applied to M&K ES employees performing covered work at the M&K Sales locations. PSUMF ¶ 63; DPSUMF ¶ 63; DSUMF ¶ 17.

Under the CBAs, the M&K ES entities were required to "remit contributions to the Fund on behalf of all employees performing covered work." PSUMF ¶ 64; DPSUMF ¶ 64; *see also* M&K ES Alsip CBA, Shah Decl., Ex. 1-F to Pls.' MSJ, ECF No. 160-17 at 13; M&K ES Joliet CBA, Shah Decl., Ex. 1-H to Pls.' MSJ, ECF No. 160-18 at 8; M&K ES Summit CBA, Shah Decl., Ex. 1-I to Pls.' MSJ, ECF No. 160-19 at 9. The CBAs also contained provisions requiring the entities to abide by the Trust Agreement and amendments thereto:

> The I.A.M. Lodge and the Company adopt, and agree to be bound by, and hereby assent to, the Trust Agreement, dated May 1960 as amended, creating the I.A.M. National Pension Fund and the Plan rules adopted by the Trustees of the I.A.M. National Pension Fund in establishing and administering the foregoing Plan pursuant to the said Trust Agreement, as currently in effect and as the Trust Plan may be amended from time to time.

M&K ES Alsip CBA at 13–14; M&K ES Joliet CBA at 9; M&K ES Summit CBA at 9.

M&K ES Summit's CBA imposed two additional provisions that were not imposed on the other M&K ES entities. First, M&K ES Summit was required to remit contributions to the

---

[6] The Fund provided separate employer I.D. codes for each M&K location. DSUMF ¶ 18; PDSUMF 18. The Fund has not assigned a code for M&K ES Northern Illinois, and M&K ES Northern Illinois has never recognized the Union. DSUMF ¶¶ 19, 30; PDSUMF ¶¶ 19, 30.

Automobile Mechanics' Local No. 701 Union and Industry Pension Fund (the "701 Pension Fund") in addition to the Fund. PSUMF ¶ 66; DPSUMF ¶ 66. Second, M&K ES Summit's CBA required M&K ES Summit to remit contributions for covered work at "any additional facilities opened during the term of [the] Agreement in McHenry, Lake, Cook, DuPage, Kane, and Will Counties" in addition to work at the M&K Sales location in Summit, Illinois. M&K ES Summit CBA at 3.

M&K ES Joliet stopped contributing to the Fund on March 31, 2017. PSUMF ¶ 65; DPSUMF ¶ 65; M&K ES Summit stopped contributing on July 31, 2017. PSUMF ¶ 65; DPSUMF ¶ 65. M&K ES Alsip stopped contributing on December 31, 2018. PSUMF ¶ 65; DPSUMF ¶ 65. By December 31, 2018, no M&K ES entity was obligated to contribute to the Fund. DSUMF ¶ 68.

### 4.  M&K ES's Relationship With M&K Sales

#### (i)  Employee Leasing by M&K ES to M&K Sales

M&K Sales did not directly hire employees. PSUMF ¶ 52; DPSUMF ¶ 52. Instead, the M&K Sales entities leased employees from their M&K ES counterparts pursuant to administrative service agreements (the "ASAs") between each M&K Sales and M&K ES entity. PSUMF ¶¶ 53–54; DPSUMF ¶¶ 53–54; DSUMF ¶ 12. Under the ASAs, M&K ES *only* leased employees to M&K Sales. PSUMF ¶ 55; DPSUMF ¶ 55. All M&K Sales employees were leased from M&K ES, although M&K Sales may have occasionally hired temporary outside labor. PSUMF ¶ 55; DPSUMF ¶ 55. The M&K ES entities were subject to contractual limitations on their ability to lease employees to competitors of M&K Sales. PSUMF ¶ 56; DPSUMF ¶ 56. Other than leasing

employees to M&K Sales, M&K ES had no other sources of revenue. PSUMF ¶ 57; DPSUMF ¶ 57.[7]

Employees leased by M&K ES performed all labor, operational, administrative, financial, accounting, and legal services for the M&K Sales dealerships. PSUMF ¶ 58; DPSUMF ¶ 58. In other words, M&K ES employees operated the M&K Sales dealerships *in toto*. *See* PSUMF ¶ 58; DPSUMF ¶ 58. M&K Sales paid M&K ES for labor services under a "cost-plus arrangement," meaning M&K Sales reimbursed M&K ES for "all costs actually incurred," including "wages, fringe benefit fund contributions, interest for delinquencies, insurance, service provider fees, and legal, accounting and other service provider fees and expenses," in addition to a "$7,500 annual administrative fee." PSUMF ¶ 59; DPSUMF ¶ 59. Notwithstanding the withdrawal liability dispute at the heart of this litigation, M&K ES received reimbursement from M&K Sales for every expense incurred. PSUMF ¶ 60; DPSUMF ¶ 60.[8] Further, M&K Sales "agreed to indemnify M&K ES against 'all demands, liability, damages, costs, and expenses . . . arising from or in connection' with the services provided by M&K ES." PSUMF ¶ 61; DPSUMF ¶ 61.

### (ii) Terms and Conditions of Employment at M&K ES

The terms and conditions of employment for M&K ES union employees were codified in the CBAs entered into by the M&K ES entities and the Union. PSUMF ¶ 69; DPSUMF ¶ 69. Both

---

[7] Boucher testified that he was "not . . . aware" of any other sources of revenue. DPSUMF ¶ 57. Defendants suggest that therefore this fact is disputed but provide no evidence that M&K ES ever received revenue from any other sources. This testimony is insufficient to create a factual dispute. The opposite, actually. It affirmatively indicates that the fact is not disputed, because it establishes that the defendants knew of no information to the contrary. *See* Fed. R. Civ. P. 30(b)(6); *see also U.S. ex rel. Emanuele v. Medicor Associates*, 242 F. Supp. 3d 409, 422–23 (W.D. Pa. 2017) (concluding from testimony that deponent was "not aware of any such contracts" that no such contracts existed).

[8] Defendants suggest that this fact is disputed because Pilecki testified that he was "not . . . aware" of any instances where M&K ES incurred expenses and M&K Sales refused to pay. Again, this testimony is not sufficient to create a factual dispute and affirmatively indicates the opposite. *See* Fed. R. Civ. P. 30(b)(6); *see also Medicor Associates*, 242 F. Supp. 3d at 422–23.

union and non-union M&K ES employees were also subject to terms and conditions codified in employee handbooks bearing M&K Sales branding. PSUMF ¶¶ 70–71; DPSUMF ¶¶ 70–71.

M&K ES did not own or lease real property at which it conducted work relating to its leasing arrangements with M&K Sales, and it did not own chattel property such as "equipment, computers, laptops, or cellphones." PSUMF ¶ 72; DPSUMF ¶ 72. M&K ES employees worked at M&K Sales dealerships on properties leased by M&K Sales. PSUMF ¶ 73; DPSUMF ¶ 73. These locations bore M&K Truck Center logos, and while working there, M&K ES employees wore uniforms bearing M&K Truck Center logos. PSUMF ¶¶ 74–75; DPSUMF ¶¶ 74–75.

M&K ES employees only used equipment provided by M&K Sales or personally owned tools stored at M&K Sales locations. PSUMF ¶ 76; DPSUMF ¶ 76. M&K ES employees used M&K Sales email addresses and communications systems. PSUMF ¶ 77; DPSUMF ¶ 77. M&K ES employee records were stored at the M&K Sales Summit dealership. PSUMF ¶ 78; DPSUMF ¶ 78. All M&K ES employee assignments and discipline were given by or issued by other M&K ES employees from the same location. DSUMF ¶¶ 36–37; PDSUMF ¶¶ 36–37.

Employees leased by M&K ES to M&K Sales were obligated to abide by the terms of contracts between M&K Sales and manufacturers of vehicles sold and serviced by M&K Sales. PSUMF ¶ 79; DPSUMF ¶ 79. This entailed that M&K ES employees maintain certifications and comply with updated training requirements. PSUMF ¶ 79; DPSUMF ¶ 79.

### (iii) Control by M&K Sales over M&K ES

In 2012, when Meyering formed M&K Sales Alsip, M&K Sales Joliet, and M&K Sales Summit, Meyering served as President of M&K Sales, Pilecki served as Vice President of Operations, Boucher served as Chief Financial Officer, and Jansma served as Treasurer. DSUMF ¶¶ 1–2; PDSUMF ¶¶ 1–2. That same year, Jansma formed the M&K ES entities, including M&K

ES Alsip, M&K ES Joliet, and M&K ES Summit, along with two other related entities.[9] PSUMF ¶ 80; DPSUMF ¶ 80. Jansma served as the sole owner of these entities until December 31, 2014, when she sold them to Boucher for $500. PSUMF ¶ 81; DPSUMF ¶ 81; DSUMF ¶ 27. In 2018, Boucher transferred an interest to his wife, Jodi Boucher, with whom he now shares 100% ownership. PSUMF ¶ 82; DPSUMF ¶ 82. This means the M&K ES entities were owned, and are currently owned, by officers of M&K Sales.[10]

Meyering and Pilecki were responsible for ultimately approving and hiring M&K ES general managers, who in turn were responsible for interviewing and hiring subordinate M&K ES employees. PSUMF ¶¶ 68, 83; DPSUMF ¶¶ 68, 83. Pilecki was involved in employee hiring and firing, although others, including the general managers approved and hired by Meyering and Pilecki, also had discretion to hire and fire employees. PSUMF ¶ 84; DPSUMF ¶ 84.[11] General

---

[9] The two related entities are M&K ES Main and M&K Employee Solutions, LLC – Illinois Leasing ("M&K Illinois Leasing"). PSUMF ¶ 80; DPSUMF ¶ 80.

[10] As the Court already explained, Jansma and Boucher currently serve as *de facto* officers of M&K Sales, although they are formally employed by M&K ESI. *See* PSUMF ¶¶ 44–47; DPSUMF ¶¶ 44–47.

[11] Defendants submitted a supplemental affidavit in which Boucher declared that "[a]ll hiring decisions of an M&K [ES e]ntity were made by another employee of that same M&K [ES e]ntity," and "[a]ll layoff or termination decisions of an M&K [ES] entity were made by another employee of that same [entity]." Boucher Decl., Ex. 12 to Defs.' MSJ, ECF No. 161-14 at 3. Defendants submitted a supplemental affidavit in which Pilecki declared that "[a]ll layoff or termination decisions of an M&K [ES] entity were made by another employee of that same [entity]," and "[e]ach Truck Sales location . . . operated independently of the other locations." Pilecki Decl., Ex. 2 to Defs.' MSJ, ECF No. 161-4 at 4. Some ink has been spilled by the parties over whether these affidavits should be disregarded under the "sham affidavit rule." Pls.' Opp'n to M&K ES's MSJ ("Pls.' Opp'n to M&K ES"), ECF No. 164 at 33; M&K ES's Reply to Trustees' Opp'n to M&K ES's MSJ ("M&K ES's Reply"), ECF No. 179 at 19–26. The Court agrees with the Trustees that these declarations should be disregarded. The sham affidavit rule "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony." *Daniel v. Johns Hopkins University*, 118 F. Supp. 3d 312, 318 (D.D.C. 2015) (quoting *Galvin v. Eli Lilly and Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007)). Defendants have not offered persuasive reasons for belatedly proffering these conclusory declarations. Defendants assert that the declarations clarify and address undeveloped deposition topics and do not "clearly contradict" prior sworn testimony and are otherwise consistent with the record evidence. M&K ES's Reply at 20. However, it is not the law of this Circuit that the Court *must* consider a supplemental affidavit unless it "clearly contradict[s]" prior sworn testimony. *Contra id.* at 20. Instead, the Court has "broad discretion with respect to discovery," and an "important consideration" in choosing whether to disregard a supplemental affidavit is whether it contradicts prior testimony or record evidence without justification. *See Eli Lilly*, 488 F.3d at 1030. In any event, the declarations quoted above are clearly contradicted by prior sworn testimony and record evidence without justification. Boucher earlier testified that he "can't speak to" whether Pilecki, who was not an M&K ES employee, was "involved in the

managers reported to Pilecki, who "conducted their performance reviews, set their compensation, and dictated when they could be away from the dealerships." PSUMF ¶ 85; DPSUMF ¶ 85. Pilecki both hired and supervised LaJeunesse, who served as the director of human resources for all four M&K ES entities. PSUMF ¶ 86; DPSUMF ¶ 86. LaJeunesse informed Pilecki "of all hiring and firing decisions of M&K ES employees, grievances, and workers' compensation claims." PSUMF ¶ 87; DPSUMF ¶ 87.

Meyering, Pilecki, and LaJeunesse were involved in labor negotiations between the M&K ES entities and the Union. PDSUMF ¶ 53. Meyering was specifically involved in negotiations concerning economics, i.e., the amount of wages and fringe benefits to be paid to M&K ES employees. PSUMF ¶ 69; DPSUMF ¶ 69. Meyering had authority to approve or reject proposals. PSUMF ¶ 88; DPSUMF ¶ 88; DSUMF ¶ 54; PDSUMF ¶ 54; *see also* Meyering Dep., Ex. 1 to Defs.' MSJ, ECF No. 161-3 at 46–47.[12]

---

interview process [for M&K ES employees]" because Boucher was not "a part of all [the] interviews." Chad Boucher Dep. A, Ex. 1 to Pls.' Opp'n to Defs.' MSJ, ECF No. 164-3 at 39–40. But despite his earlier ignorance, Boucher now declares definitively, and without explanation, that all M&K ES hiring decisions were made by M&K ES employees. Boucher Decl. at 3. George P. LaJeunesse ("LaJeunesse"), an M&K ES employee, gave uncontested testimony that he was hired by Pilecki to serve as Human Resources manager for the M&K ES entities. LaJeunesse Dep., Ex. 15 to Defs.' MSJ, ECF No. 161-17 at 13–15. And defendants cannot dispute that Meyering and Pilecki interviewed and hired M&K ES general managers. PSUMF ¶¶ 68, 83; DPSUMF ¶¶ 68, 83. With respect to Pilecki's declaration that all layoff or termination decisions were made by M&K ES employees, LaJeunesse earlier testified that Pilecki was the "final decision maker" with respect to terminating employees. *Id.* at 17. Pilecki did not deny that he was a decision maker and in fact conceded his involvement in all manner of personnel decisions, including terminations. Pilecki Dep., Ex. 1 to DPSUMF, ECF No. 170-1 at 21–23. Finally, the declaration that each M&K Sales location operated independently of the other locations is obviously contradicted by the undisputed evidence of common ownership, management, service providers, employee terms and conditions, and shared job functions recounted throughout this opinion. Neither affidavit proffers a reason that could justify its existence. The Court harbors no doubt that these declarations were prepared in a spurious attempt to create "an issue of material fact" and thereby preclude summary judgment. *See Eli Lilly*, 488 F.3d at 1030. In any event, these bare and belated declarations are immaterial and their omission has no bearing on the Court's analysis.

[12] Defendants contend that this is disputed, yet concede that Meyering was involved in the negotiations, and that LaJeunesse testified that his understanding was that Meyering had the final say. PSUMF ¶ 88; DPSUMF ¶ 88. Moreover, Meyering himself testified that he sat in on bargaining sessions because it was more efficient "than somebody else negotiating it and then bringing it to me for *approval*." Meyering Dep. at 46–47 (emphasis added). Defendants cite no evidence to the contrary.

The law firm of Mika, Myers, Becket, & Jones PEC ("Mika Myers") provided legal services to both M&K Sales and M&K ES. PSUMF ¶ 94; DPSUMF ¶ 94. Mika Myers drafted the ASA between M&K Sales Alsip and M&K ES Alsip, as well as M&K ES's operating agreement. PSUMF ¶ 96; DPSUMF ¶ 96. The ASAs between M&K Sales and M&K ES were not negotiated or renegotiated. PSUMF ¶ 97; DPSUMF ¶ 97. Additionally, M&K ES retained Donald J. Vogel, Esq. ("Vogel") to provide legal services. PSUMF ¶ 98–100; DPSUMF ¶ 98–100. Vogel led collective bargaining negotiations on behalf of M&K ES. PSUMF ¶ 100; DPSUMF ¶ 100.

M&K ES and M&K Sales shared other services. Both M&K ES and M&K Sales received accounting services from Crowe Horwath LLP ("Crowe"). PSUMF ¶ 101; DPSUMF ¶ 101. Both M&K ES and M&K Sales maintained bank accounts at Fifth Third Bank. PSUMF ¶ 102; DPSUMF ¶ 102. Both M&K ES and M&K Sales were registered at the same address. PSUMF ¶ 103; DPSUMF ¶ 103. All M&K ES and M&K Sales entities operated out of the same physical locations, namely the M&K Sales dealerships. PSUMF ¶ 103; DPSUMF ¶ 103.

### 5.   Creating M&K ES Northern Illinois

M&K Sales Northern Illinois was created on June 6, 2013, to purchase assets of an existing dealership located in Cook County, Illinois. DSUMF ¶¶ 20, 123; PDSUMF ¶¶ 20, 123. M&K ES Northern Illinois was formed by Jansma in July 2013 to hire employees from the former dealership and lease them to the new M&K Sales Northern Illinois dealership. DSUMF ¶¶ 21–22; PDSUMF ¶¶ 21–22.

M&K ES Northern Illinois did not have a CBA in place with the Union. DSUMF ¶ 26; PDSUMF ¶ 26. However, assuming the M&K ES Summit CBA applied to employees at M&K Sales Northern Illinois, M&K ES Northern Illinois employees performed 226,952 hours of labor for which M&K ES was required to remit contributions to the Fund. PSUMF ¶¶ 105–06; DPSUMF

¶¶ 105–06.[13] At no point were contributions remitted for M&K ES Northern Illinois employees. PSUMF ¶ 113; DPSUMF ¶ 113.

Steve Waters ("Waters"), who was an employee of M&K ES Northern Illinois, served first as general manager of M&K Sales Northern Illinois before being promoted to Regional Vice President of Operations. PSUMF ¶ 108; DPSUMF ¶ 108. As Regional Vice President, Waters was responsible for overseeing and providing guidance to general managers of the M&K Sales dealerships in Illinois, including M&K Sales Summit and M&K Sales Northern Illinois. PSUMF ¶ 108; DPSUMF ¶ 108. David Wilkey ("Wilkey"), who was the sales manager at M&K Sales Summit, supervised two M&K ES Summit employees while they worked out of the M&K Sales Northern Illinois location. PSUMF ¶ 109; DPSUMF ¶ 109. And, LaJeunesse, who was an employee of M&K ES Summit, was "in charge" of human resources for both locations. PSUMF ¶ 110; DPSUMF ¶ 110. Payroll, billing, and bank accounts for MK ES Northern Illinois and M&K ES Summit were handled by Laura Schneider ("Schneider") and Kathy Milarg ("Milarg"), both of whom were employed by M&K ES Summit. PSUMF ¶ 111; DPSUMF ¶ 111.[14] All M&K ES entity personnel records, including records for M&K ES Northern Illinois and M&K ES Summit,

---

[13] The Trustees have provided evidence of the categories of work covered by the M&K ES Summit CBA, the categories of work performed by M&K ES Northern Illinois employees, hours worked by M&K ES Northern Illinois employees, and contributions, interest, and liquidated damages calculations assuming the M&K ES Summit CBA actually applies. M&K ES Summit CBA at 6–9, 13–17; Schneider Dep., Shah Decl., Ex. 8 to Pls.' MSJ, ECF No. 160-27 at 33–36; Defs.' Resp. to Pls.' Third Set of Requests for Admissions, Shah Decl., Ex. 34 to Pls.' MSJ, ECF No. 160-53 at 3–35; Summary of Damages, Shah Decl., Ex. 35 to Pls.' MSJ, ECF No. 160-54 at 2–10. Defendants claim "[t]here is no cognizable way to understand Plaintiffs' cites," but the Court understands them just fine. *Contra* DPSUMF ¶ 106. Defendants have submitted no evidence to the contrary (though, of course, they dispute that the M&K ES Summit CBA covers work performed by M&K ES Northern Illinois employees, which is one of the legal issues presently before the Court), and therefore this factual contention is not disputed.

[14] Defendants purport to dispute this point, but Schneider testified that she and Milarg were employed by M&K ES Summit and defendants have offered no evidence to the contrary. Schneider Dep., Ex. 14 to Defs.' MSJ, ECF No. 161-16 at 17–18, 59.

were stored next to Laura Schneider's office at the M&K Sales Summit dealership location. PSUMF ¶ 112; DPSUMF ¶ 112.[15]

### 6. Chad and Jodi Boucher's Home Flipping Operation

Chad Boucher and his wife Jodi Boucher (the "Bouchers") owned M&K ES Alsip. PSUMF ¶ 20; DPSUMF ¶ 20. During the period that the Bouchers owned M&K ES Alsip, they also engaged in the practice of "buying [homes], making improvements, and then reselling [the homes]," which is colloquially known as "flipping homes." PSUMF ¶ 21; DPSUMF ¶ 21.

The Bouchers used personal funds "to purchase homes to 'flip' in their own name." PSUMF ¶ 23; DPSUMF ¶ 23. After completing a sale, the Bouchers would use the proceeds to pay any expenses and purchase another home to "flip." PSUMF ¶ 24; DPSUMF ¶ 24. Jodi Boucher served as the "brains of the operation" and personally identified candidate properties, negotiated their purchase and sale, planned improvements and renovations, retained contractors, conducted demolition, oversaw contractor work, and paid contractors and suppliers. PSUMF ¶ 25; DPSUMF ¶ 25. Jodi typically spent every day on-site at the renovated properties making improvements. Pls.' Statement of Additional Undisputed Material Facts ("PASUMF"), ECF No. 163-1 ¶ 63; Bouchers' Resp. to PASUMF ("BPASUMF"), ECF No. 178 ¶ 63. Chad Boucher personally performed landscaping at the properties, reconciled costs, and prepared and filed the Bouchers' joint tax returns. PSUMF ¶ 26; DPSUMF ¶ 26.

---

[15] Defendants submitted supplemental affidavits in which Pilecki and Boucher both declared that "[e]mployees did not transfer between the different Truck Sale entity locations or [M&K ES e]ntities," "[n]o . . . Summit employee worked at M&K [ES Northern Illinois] and vice versa," and "[n]o . . . Summit employee supervised any M&K [ES Northern Illinois] employee and vice versa." Pilecki Decl. at 4–5; Boucher Decl. at 3–4. The Court will disregard these conclusory declarations under the previously recounted "sham affidavit rule" because, among other reasons, they are clearly contradicted by prior testimony and record evidence establishing that certain M&K ES employees (such as LaJeunesse, Milarg, Waters, and Wilkey) worked, supervised, or transferred across entities. *See, e.g.*, PSUMF ¶¶ 108–12; DPSUMF ¶¶ 108–12. The Court has already made clear what it thinks of these affidavits and is satisfied upon review of the record and their inconsistencies therewith that these affidavits were prepared for the purpose of manufacturing spurious factual disputes and avoiding summary judgment. *See Eli Lilly*, 488 F.3d at 1030. In any event, the Court does not rely on their omission.

The Bouchers testified that they hoped to earn profit—not incur losses—on the homes that they renovated. Chad Boucher Dep. B, Ex. 4 to Pls.' MSJ, ECF No. 164-23 at 20–21; Jodi Boucher Dep., Ex. 5 to Pls.' MSJ, ECF No. 164-24 at 5, 11. Chad Boucher also affirmed that he and his wife's activities constituted a business. Chad Boucher Dep. B at 20–21. The Bouchers reported the gains from their home flipping operation on their 2017 tax return on "Schedule D – Capital Gains and Losses, Part I, Short-Term Capital Gains and Losses – Assets Held One Year or Less." Bouchers' Statement of Undisputed Material Facts ("BSUMF"), ECF No. 162-2 ¶ 33; Pls.' Resp. to BSUMF ("PBSUMF"), ECF No. 163-1 ¶ 33. The Bouchers did *not* file the gains from the operation on "Schedule C – Profit or Loss from Business" or "Schedule E – Supplemental Income and Loss." BSUMF ¶ 33; PBSUMF ¶ 33.

The Bouchers purchased and sold four homes in total between 2016 and the end of 2018. PSUMF ¶¶ 28–31; DPSUMF ¶¶ 28–31. They purchased their first home on June 9, 2016 for $98,000 and sold it for $209,900 on February 27, 2017. PSUMF ¶ 28; DPSUMF ¶ 28. They purchased their second home on March 30, 2017 for $127,500 and sold it for $227,000 on November 6, 2017. PSUMF ¶ 29; DPSUMF ¶ 29. They purchased their third home on November 20, 2017 for $96,000 and sold it for $246,000 on August 7, 2018. PSUMF ¶ 30; DPSUMF ¶ 30. They purchased their fourth home on September 21, 2018 for $105,000, which was sold for $192,000 on March 6, 2019. PSUMF ¶ 31; DPSUMF ¶ 31. The Bouchers transferred the fourth home to M&K ES Main on December 28, 2018 for $1.00, before it was sold in 2019.[16] PASUMF ¶ 52; BPASUMF ¶ 52.

---

[16] As discussed below, the Court will permit defendants leave to correct their responses to plaintiffs' fourth set of requests for admissions. Defs.' Mot. for Leave to Amend Responses (Defs.' Mot. for Leave), ECF No. 176. The proposition stated by the Court incorporates the defendants' amended response.

The Bouchers continued renovating and flipping homes after the end of 2018. PASUMF ¶¶ 53–60; BPASUMF ¶¶ 53–60. On August 16, 2019, Chad Boucher established CJKA Properties, LLC ("CJKA"). PASUMF ¶ 54; BPASUMF ¶ 54. CJKA purchased and resold several homes, which Jodi Boucher renovated, between September 2019 and August 2021. PASUMF ¶¶ 56–60; BPASUMF ¶¶ 56–60. By 2020, the Bouchers reported Jodi's occupation on their federal income tax return as "home remodeling." PASUMF ¶¶ 55; BPASUMF ¶¶ 55. The Bouchers' 2020 tax return also contains a "Schedule C – Profit or Loss from Business" form for CJKA's "home remodeling" activities and reported tens of thousands of dollars in net profit. PASUMF ¶ 68; BPASUMF ¶¶ 68.

### 7.  Termination of the M&K ES CBAs

Meyering was "aware of a number of trucking companies or trucking-related companies over the years that appeared to [him] to be good companies [that went] went out of business[, and] attribute[d] the[ir] failure . . . to withdrawal liability." PSUMF ¶ 114; DPSUMF ¶ 114. At the time Meyering purchased the dealerships that became M&K Sales Alsip, M&K Sales Joliet, and M&K Sales Summit, Meyering knew that both the Fund and the 701 Pension Fund were underfunded. PSUMF ¶ 115; DPSUMF ¶ 115. Then, during bargaining negotiations with the Union, the M&K ES entities secured a "free look," which allowed them to participate in the Fund "without incurring withdrawal liability if the obligation to contribute was terminated within five years." PSUMF ¶ 116; DPSUMF ¶ 116. Meyering reviewed withdrawal estimates in the lead up to negotiations with the Union and requested a withdrawal liability estimate in advance of negotiations on at least one occasion. PSUMF ¶ 117; DPSUMF ¶ 117.

M&K ES Joliet and M&K ES Summit terminated their CBAs in 2017 within the "free look" period. PSUMF ¶ 118; DPSUMF ¶ 118. Meyering supported terminating the CBAs at that

time because it meant the entities would not be on the hook for withdrawal liability. PSUMF ¶ 118; DPSUMF ¶ 118. However, M&K ES Alsip failed to terminate its CBA before the expiry of the "free look" window. PSUMF ¶ 120; DPSUMF ¶ 120. M&K ES Alsip terminated its obligation to contribute to the Fund on December 31, 2018. PSUMF ¶ 120; DPSUMF ¶ 120.

### 8. Employee Transfers from M&K ES to Laborforce and M&K ESI

M&K Sales stopped leasing employees from M&K ES on December 31, 2018. PSUMF ¶ 121; DPSUMF ¶ 121. The next business day, M&K Sales began leasing employees from Laborforce and M&K ESI. PSUMF ¶ 122; DPSUMF ¶ 122.

Laborforce was formed by Jansma on October 25, 2018; Jansma serves as Laborforce's sole owner. PSUMF ¶ 123; DPSUMF ¶ 123. Laborforce entered into collective bargaining agreements with the Union covering employees working at M&K Sales Alsip and M&K Sales Summit in December 2018 and February 2019 respectively. PSUMF ¶¶ 124–25; DPSUMF ¶¶ 124–25. Neither CBA requires Laborforce to contribute to the Fund or the 701 Pension Fund. PSUMF ¶ 126; DPSUMF ¶ 126. Vogel served as chief negotiator with the Union for these CBAs. PSUMF ¶ 127; DPSUMF ¶ 127. Meyering, Pilecki, and LaJeunesse were also involved in the negotiations. PSUMF ¶ 127; DPSUMF ¶ 127.

Laborforce "hired all 127 union employees previously employed by M&K ES Alsip . . . and Summit." PSUMF ¶ 128; DPSUMF ¶ 128. Laborforce then entered into ASAs with M&K Sales Alsip and M&K Sales Summit and began leasing the former M&K ES employees to them. PSUMF ¶¶ 129–30; DPSUMF ¶¶ 129–30. The former M&K ES employees "performed the same work, from the same locations, and . . . reported to the same supervisors as before." PSUMF ¶ 131; DPSUMF ¶ 131. However, Laborforce was not obligated to remit contributions to the Fund for work performed by Laborforce employees. PSUMF ¶ 126; DPSUMF ¶ 126. Jansma believed

there was "no risk" of having to pay withdrawal liability under this arrangement. PSUMF ¶ 132; DPSUMF ¶ 132.

M&K ESI "hired all of the non-union employees previously employed by M&K ES Alsip . . . and Summit . . . and leased them to the corresponding M&K Sales entity." PSUMF ¶ 133; DPSUMF ¶ 133. M&K ESI also hired the non-union employees previously employed by M&K ES Joliet and M&K ES Northern Illinois. PSUMF ¶ 134; DPSUMF ¶ 134. M&K ESI was owned by Meyering until late 2017, when its ownership was transferred to a corporation owned by Pilecki, Boucher, and trusts created for Meyering's children. PSUMF ¶¶ 135–36; DPSUMF ¶¶ 135–36. M&K ESI never arranged ASAs with the M&K Sales dealerships in Illinois. PSUMF ¶ 137; DPSUMF ¶ 137. The former M&K ES employees "performed the same work, from the same locations, for the same wages and benefits, and reported to the same supervisors as before." PSUMF ¶ 138; DPSUMF ¶ 138.

Mika Meyer provides legal services for Laborforce. PSUMF ¶ 140; DPSUMF ¶ 140. Vogel provides legal services for Laborforce and M&K ESI. PSUMF ¶ 140; DPSUMF ¶ 140. Crowe provides tax and accounting services for Laborforce and M&K ESI. PSUMF ¶ 141; DPSUMF ¶ 141. LaJeunesse became an employee of M&K ESI and continued his previous duties, which included overseeing human resources for all the M&K Sales dealerships in Illinois. PSUMF ¶¶ 86, 143; DPSUMF ¶¶ 86, 143. Laborforce maintains a bank account at Fifth Third Bank. PSUMF ¶ 144; DPSUMF ¶ 144. And in some instances, M&K ESI honored accrued vacation days and "grandfathered accrued retirement benefits" for its former M&K ES non-union employees. PSUMF ¶ 145; DPSUMF ¶ 145.

### 9.  The Fund's Withdrawal Liability Assessments

The Fund sent Vogel and M&K ES a demand for $611,110 in partial withdrawal liability stemming from M&K ES Joliet and M&K ES Summit on June 26, 2018. PSUMF ¶ 146; DPSUMF ¶ 146. That same day, the Fund provided Vogel and M&K ES with an estimate that if M&K ES Alsip were to completely withdraw from the Fund, it would owe $5,829,629 in withdrawal liability. PSUMF ¶ 147; DPSUMF ¶ 147. Similarly, on October 11, 2018, the 701 Pension Fund assessed M&K ES Summit with $6,215,168 in complete withdrawal liability. PSUMF ¶ 148; DPSUMF ¶ 148. Consequently, "there were a number of people that were concerned that M&K [ES] could[ not] survive" an assessment of withdrawal liability. PSUMF ¶ 149; DPSUMF ¶ 149.

After M&K ES Alsip ceased its obligation to contribute to the Fund on December 31, 2018, the Trustees withdrew its earlier assessment against M&K ES for $611,110 in partial withdrawal liability. PSUMF ¶ 150; DPSUMF ¶ 150. On June 14, 2019, the Fund notified M&K ES Alsip that it was assessing it "$6,158,482 in withdrawal liability [stemming from its complete withdrawal] payable in quarterly installments commencing August 13, 2019." PSUMF ¶ 151; DPSUMF ¶ 151; DSUMF ¶ 69. M&K ES Alsip requested a review of that assessment on September 10, 2019, which the Trustees denied. PSUMF ¶ 152; DPSUMF ¶ 152; DSUMF ¶ 71. M&K ES Alsip then commenced arbitration on November 20, 2019. PSUMF ¶ 152; DPSUMF ¶ 152; DSUMF ¶ 71.

M&K ES Alsip did not fulfill its first two quarterly payment obligations while it challenged the Fund's withdrawal liability assessment. PSUMF ¶ 153; DPSUMF ¶ 153.

### 10. Events Occurring During Litigation

The Trustees commenced this suit on February 14, 2020 to recover the two failed quarterly payments under the "pay now, dispute later" rule. Compl., ECF No. 1.

On March 19, 2020, the Court ordered the defendants to pay $705,442 to the Fund. ECF No. 22 (the "March 2020 Injunction"). On March 27, 2020, Vogel responded to a letter from the Trustees "demand[ing] payment from M&K Employee Solutions, LLC" for $705,422.00 by stating "that M&K is financially unable to make any payment to the Trustees." M&K Unable to Pay Letter, Shah Decl., Ex. 2 to Pls.' MSJ, ECF No. 160-21 at 2; *see also* PSUMF ¶ 154; DPSUMF ¶ 154. On September 10, 2020, the Trustees accelerated the withdrawal liability associated with M&K ES Alsip by notifying it that "there was a 'substantial likelihood' that M&K ES Alsip would be unable to pay the withdrawal liability, declar[ing] M&K ES Alsip in default, accelerat[ing] the liability, and demand[ing] immediate payment of the entire $6,158,482 outstanding amount." PSUMF ¶ 155; DPSUMF ¶ 155; DSUMF ¶¶ 72, 80.

After the Trustees commenced the instant case, defendants made two payments totaling $11,487 to the Fund. PSUMF ¶ 156; DPSUMF ¶ 156; DSUMF ¶ 82–83. On July 13, 2021, an arbitrator ordered that the Fund's withdrawal liability assessment be recalculated. PSUMF ¶ 157; DPSUMF ¶ 157. This resulted in a reduction in the withdrawal liability from $6,158,482 to $1,797,781. PSUMF ¶ 158; DPSUMF ¶ 158. On July 20, 2021, the Fund sent a letter to defendants stating:

> Petitioner's recalculated withdrawal liability is $1,797,781, and as a result of the Fund's September 10, 2020 acceleration of the liability, $1,786,294—the entire amount of the recalculated liability, less the $11,487 in interim payments made to date—is due immediately.

DSUMF ¶ 88; PDSUMF ¶ 88. On August 16, 2021, Vogel wired $1,786,294 from his attorney trust account to the Fund. PSUMF ¶ 159; DPSUMF ¶ 159.

On September 28, 2022, the Court vacated the arbitrator's order that the Fund recalculate the withdrawal liability assessment. *Arbitration Decision*, 2022 WL 4534998, at *21. The Fund

served a second revised withdrawal liability assessment for $6,078,739 on October 24, 2022.[17]
PDSUMF ¶ 162.

### C. Procedural History

The Trustees filed their complaint on February 14, 2020. Compl. In addition to naming
M&K ES Alsip, their complaint named M&K ES Main, M&K Illinois Leasing, M&K ES Joliet,
M&K ES Summit, and M&K ES Northern Illinois as "trade[s] or business[es] under common
control" with M&K ES Alsip when it withdrew from the Fund. *Id.* ¶ 27–31. Along with their first
complaint, the Trustees moved for a preliminary injunction. ECF No. 2. The motion asked for the
immediate payment of $705,442, which was the sum of the first two unpaid withdrawal-liability
payments, plus "liquidated damages, interest, attorneys' fees, and costs, in an amount to be
determined." ECF No. 2-1 at 8. Defendants did not oppose, and the Court granted the first
preliminary injunction. ECF No. 22. Despite this Court's order, M&K ES Alsip made no interim
payments. *IAM II*, 2022 WL 594539, at *3.

On October 1, 2020, the Trustees filed a Second Amended Complaint which added the
M&K Sales entities as defendants: M&K Sales Alsip, M&K Sales Joliet, M&K Sales Summit, and
M&K Sales Northern Illinois. Second Am. Compl., ECF No. 45. The Trustees alleged that each
M&K Sales entity was either a single employer, joint employer, or alter-ego of the corresponding
M&K ES entity, constructed to insulate the former from the "rights and obligations of the latter
under their collective bargaining agreements with various local unions." *Id.* ¶ 4.

On March 11, 2021, the Trustees filed a Third Amended Complaint, which added
defendant Laborforce as M&K ES's alleged successor. Third Am. Compl., ECF No. 56.

---

[17] Trustees served this revised assessment eighteen days *after* they filed their motion for summary judgment. *See* Pls.'
MSJ, ECF No. 160 (filed October 7, 2022).

Defendants did not pay the accelerated withdrawal liability or any interim payments, and so the Trustees moved for a second preliminary injunction. ECF No. 62. The second injunction, entered a year after the first, ordered defendants—including Laborforce as successor—to pay the full $6,158,482 of withdrawal liability assessed by the Trustees. ECF No. 70 ("the April 2021 Injunction"). After that injunction, defendants made two small payments to the Fund—$1,000 on April 27, 2021, and $10,487 on May 20, 2021. *IAM II*, 2022 WL 594539, at *4. But defendants refused to immediately pay the full amount of the withdrawal liability due, as ordered. *Id.* Instead, defendants appealed the preliminary injunction to the D.C. Circuit. ECF No. 85. During the same period, Laborforce separately moved to dismiss for failure to state a claim. Laborforce's Mot. to Dismiss, ECF No. 71.

The concurrent arbitration that M&K ES Alsip initiated on November 19, 2019, came to a head on July 13, 2021, when an arbitrator determined that the Fund had erred in its assessment and ordered the Fund to recalculate the proper amount of withdrawal liability. *IAM II*, 2022 WL 594539, at *4. The Fund recalculated the withdrawal liability assessment to the amount of $1,797,781. *Id.* On August 16, 2021, over two years after it received notification from the Trustees regarding withdrawal liability, the M&K ES entities made their first substantial payment by wiring the Fund $1,786,294. *Id.* When combined with small payments the M&K ES Entities had made in the past, this substantial payment meant the defendants had now paid an amount equivalent to the recalculated principal withdrawal liability. *Id.*

After the arbitrator's determination, both parties filed motions. Defendants jointly moved for partial summary judgment. ECF No. 100. The Trustees moved for leave to file a Fourth Amended Complaint to add M&K ESI as M&K ES's alleged successor. ECF No. 91. The Court could not act on these and other motions filed by the parties until the defendants' appeal of the

April 2021 Injunction to the D.C. Circuit was completed. *IAM II*, 2022 WL 594539, at *4. After the Circuit remanded to this Court and dismissed the appeal as moot, the Court ruled on the parties' motions. Order, *Trs. of the IAM Nat'l Pension Fund*, Case No. 21-7072 (D.C. Cir. Dec. 23, 2021); Order, *Trs. of the IAM Nat'l Pension Fund*, Case No. 21-7072 (D.C. Cir. Jan. 11, 2022). The Court denied the defendants' motion for partial summary judgment and Laborforce's motion to dismiss. *IAM II*, 2022 WL 594539, at *15. The Court also granted the Trustees motion for leave to amend their complaint; the Trustees filed a Fourth Amended Complaint on March 1, 2022. *Id.*; *see also* Fourth Am. Compl., ECF No. 117.

On June 22, 2022, the Trustees filed a Fifth Amended Complaint, which added defendants Chad and Jodi Boucher for allegedly running "an unincorporated trade or business . . . under common control with M&K [ES] Alsip." Fifth Am. Compl., ECF No. 143 ¶¶ 98–99. The Trustees' Fifth Amended Complaint contains ten counts, eight of which are the subject of the summary judgment motions currently pending before the Court. *Id.* ¶¶ 52–101.

On September 28, 2022, the Court issued a Memorandum Opinion in a related case in which it vacated the arbitrator's award directing the Fund to recalculate the withdrawal liability assessment. *Arbitration Decision*, 2022 WL 4534998, at *21. The parties filed the instant motions for summary judgment approximately one week later.

On April 10, 2023, the defendants noticed the Court that the arbitrator had delivered an arbitration award in M&K ES's favor. ECF No. 188. The arbitrator's award concluded that the defendants' previous payments should be credited toward withdrawal liability instead of accrued interest. ECF No. 188-1. That issue is currently before this Court on summary judgment and was fully briefed by the parties before the arbitrator issued his award. The Trustees substantively

responded and noticed the Court that they had initiated a new action seeking to vacate the arbitrator's award. ECF No. 189.[18] The defendants submitted a brief reply. ECF No. 190.

### D.  Motions Presently Before the Court

There are five motions presently before the Court.

On October 7, 2022, the Trustees moved for summary judgment on Counts I, II, III, IV, VI, VII, VIII, and X. Pls.' MSJ, ECF No. 160.[19] The Trustees seek judgment that:

(1) M&K ES Alsip is liable for unpaid withdrawal liability,[20] interest, and liquidated damages ("Count I");

(2) M&K ES Main, M&K Illinois Leasing, M&K ES Joliet, M&K ES Summit, and M&K ES Northern Illinois are jointly and severally liable for the claims asserted in Counts I and III under the theory that they are "trades or businesses under common control with M&K ES Alsip" ("Count II");

(3) M&K ES Summit is liable for unpaid contributions, interest, and liquidated damages ("Count III");

(4) Each M&K Sales entity is jointly and severally liable for the claims asserted in Counts I and III under the theory that each entity is a "[s]ingle employer with the corresponding M&K ES entity" ("Count IV");

---

[18] That action, Civil Case No. 23-cv-991, is stayed pending the Court's resolution of the parties' pending motions for summary judgment. No. 23-cv-991, ECF No. 18.

[19] Trustees do not seek summary judgment with respect to Count V. Pls.' MSJ at 29 n.3. Trustees previously dismissed the entity-defendants named in Count IX pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). ECF No. 154.

[20] The Trustees' claim reflects the second revised withdrawal liability assessment, which was served on defendants eighteen days *after* Trustees filed their motion for summary judgment. *See* Pls.' Reply to Defs.' Opp'n ("Pls.' Reply"), ECF No. 174 at 10 & n.3. The parties' earlier summary judgment briefing does not reflect this amount.

(5) Each M&K Sales entity is jointly and severally liable for the claims asserted in Counts I and III under the theory that each entity is an "[a]lter ego with the corresponding M&K ES entity" ("Count VI");

(6) Laborforce is jointly and severally liable for the claims asserted in Counts I and III under a theory of "successor [liability] to M&K ES Alsip and Summit" ("Count VII");

(7) M&K ESI is jointly and severally liable for the claims asserted in Counts I and III under a theory of "successor [liability] to M&K ES Joliet and Northern Illinois" ("Count VIII"); and

(8) Chad and Jodi Boucher are jointly and severally liable for the claims asserted in Counts I and III under the theory that they operated a "trade[] or business[] under common control with M&K ES Alsip" ("Count X").

*Id.* at 28–29. The defendants separately opposed. Bouchers' Opp'n to Pls.' MSJ ("Bouchers' Opp'n"), ECF No. 165; M&K ES's Opp'n to Pls.' MSJ ("M&K ES's Opp'n"), ECF No. 166; M&K Sales's Opp'n to Pls.' MSJ ("M&K Sales's Opp'n"), ECF No. 167; Laborforce's Opp'n to Pls.' MSJ ("Laborforce's Opp'n"), ECF No. 168; M&K ESI's Opp'n to Pls.' MSJ ("M&K ESI's Opp'n"), ECF No. 169. Trustees replied. Pls.' Reply.

On October 7, 2022, M&K ES moved for summary judgment on Counts I, II, and III. M&K ES's MSJ, ECF No. 161-1. M&K ES seeks summary judgment with respect to Counts I and II regarding the method of calculating accrued interest and applying prior payments. *Id.* at 7. M&K ES seeks a judgment that M&K ES Summit is not liable for delinquent contributions under Count III. *Id.* at 8. Trustees opposed. Pls.' Opp'n to M&K ES. M&K ES replied. M&K ES's Reply.

On October 7, 2022, the Bouchers moved for summary judgment on Count X. Bouchers' MSJ, ECF No. 162-1. The Bouchers seek a judgment that they cannot be held liable for the

withdrawal liability of the M&K ES defendants. *Id.* at 5–6. Trustees opposed. Pls.' Opp'n to Bouchers, ECF No. 163. The Bouchers replied. Bouchers' Reply to Pls.' Opp'n to Bouchers ("Bouchers' Reply"), ECF No. 177.

On December 16, 2022, M&K ES Main moved for leave to correct their responses to plaintiffs' fourth set of requests for admissions. Defs.' Mot. for Leave. M&K ES Main alleges that it mistakenly admitted a fact and is entitled to amend or correct it. *Id.* at 4. Trustees opposed. Pls.' Opp'n to Defs.' Mot. for Leave ("Pls.' Opp'n for Leave"), ECF No. 181. M&K ES replied. Defs.' Reply to Pls.' Opp'n for Leave ("Defs.' Reply for Leave"), ECF No. 183.

On January 3, 2023, M&K ES moved this Court to clarify or reconsider its February 28, 2022 opinion, *IAM II*, which denied the defendants' earlier motion for partial summary judgment. Defs.' Mot. to Clarify or Reconsider ("Defs.' Mot. to Clarify"), ECF No. 182. Trustees opposed. Pls.' Opp'n to Defs.' Mot. to Clarify ("Pls.' Opp'n to Clarify"), ECF No. 184. Defendants replied. Defs.' Reply to Pls.' Opp'n to Clarify ("Defs.' Reply to Clarify"), ECF No. 185.

These motions are ripe for review. There are no genuine issues of material fact.

## II.    LEGAL STANDARDS

### A. Amending or Withdrawing Admissions Under Rule 36

Rule 36 of the Federal Rules of Civil Procedure governs requests for admissions as well as their amendment and withdrawal. "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). A "court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." *Id.* Rule 36(b) sets forth a two-prong test for permitting amendments: (1) whether amendment would promote the presentation of the merits of

the action; and (2) whether amendment would prejudice the party opposing the motion to amend. *Haynes v. Navy Federal Credit Union*, 296 F.R.D. 9, 13 (D.D.C. 2013). "Put more directly, withdrawal is permissible if a party demonstrates that withdrawal will serve the presentation of the merits without prejudicing the party who requested the admissions." *Baker v. Potter*, 212 F.R.D. 8, 12 (D.D.C. 2002).

## B. Motion to Clarify or Reconsider

"[T]here is no Federal Rule of Civil Procedure specifically governing 'motions for clarification.'" *United States v. Philip Morris U.S. Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011). "The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend." *Id.* (quoting *Resolution Trust Corp. v. KPMG Peat Marwick*, No. 92-cv-1373, 1993 WL 211555, at *2 (E.D. Pa. June 8, 1993)). Parties are encouraged to request clarification when they are uncertain about the scope of a ruling or its application "in a concrete context or particular factual situation." *United States v. Philip Morris U.S. Inc.*, No. 99-cv-2496 (PLF), 2023 WL 4057501, at *4 (D.D.C. June 19, 2023) (quoting *Philip Morris*, 793 F. Supp. 2d at 168–69). However, a motion for clarification, like a motion for reconsideration, is "not simply an opportunity to reargue facts and theories upon which a court has already ruled." *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 81 (D.D.C. 2015) (quoting *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995)).

A motion to reconsider a denial of summary judgment is evaluated under Rule 54(b). *Singh v. Am. Ass'n of Retired Persons, Inc.*, No. 1:18-cv-1247 (RCL), 2020 WL 4039118, at *1 (D.D.C. July 17, 2020). Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P.

54(b). The judicial interest in finality disfavors reconsideration, but a Court may do so "as justice requires." *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 30 (D.D.C. 2013); *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004). Although this standard is flexible and allows a district court to exercise broad discretion, there must be good reason to reconsider an issue already litigated by the parties and decided by the court, such as new evidence, a patent misunderstanding by the Court, clear error, or intervening changes in controlling law. *See Doe I v. Exxon Mobil Corp.*, No. 01-cv-1357 (RCL), 2019 WL 2348100, at *3 (D.D.C. June 3, 2019); *Isse v. Am. Univ.*, 544 F. Supp. 2d 25, 29 (D.D.C. 2008); *Cobell v. Norton*, 355 F. Supp. 2d 531, 540 (D.D.C. 2005); *All. of Artists & Recording Cos. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 415–16 (D.D.C. 2016).

### C. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the outset, the movant bears the burden of "identifying those portions of the record it believes 'demonstrate the absence of a genuine issue of material fact.'" *White v. Wash. Nursing Facility*, 206 F. Supp. 3d 137, 143 (D.D.C. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once the movant has made an "adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). Summary judgment is also proper if the non-movant "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322).

A party asserting that a fact cannot be genuinely disputed, or that a fact is genuinely disputed, must support that assertion by either (a) "citing to particular parts of materials in the record," or (b) "showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). The party opposing summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Finally, at the summary-judgment posture, the Court may not make credibility determinations or weigh the evidence. *Id.* at 255.

## III.   DISCUSSION

Pending before the Court are five motions: (1) M&K ES Main's motion for leave to correct their responses to the Trustees' fourth set of requests for admissions; (2) M&K ES's motion to clarify or reconsider this Court's February 28, 2022 opinion, *IAM II*, which denied the defendants' earlier motion for partial summary judgment; (3) Trustees' motion for summary judgment; (4) M&K ES's cross-motion for summary judgment; and (5) the Bouchers' cross-motion for summary judgment. For the reasons that follow, the Court will **GRANT** M&K ES Main's motion for leave; **DENY** M&K ES's motion to clarify or reconsider; **GRANT** the Trustees' motion for summary judgment; and **DENY** M&K ES's and the Bouchers' motions for summary judgment.

**A. Motion to Correct Responses to Plaintiff's Requests for Admissions**

Defendant M&K ES seeks leave to amend a response to a request for admission that it alleges was mistaken, inaccurate, and inconsistent with evidence in the record.

The Trustees served their Fourth Set of Requests for Admissions on M&K ES on April 15, 2022. Defs.' Mot. for Leave at 4. Defendant M&K ES served its responses on May 16, 2022. *Id.* M&K ES responded to Request for Admission No. 16 ("RFA No. 16") as follows:

> 16. In January 2019, Chad and Jodi Boucher transferred the Benjamin Avenue Property to M&K Employees.
> **ANSWER**: [M&K ES] admits Request No. 16.

*Id.* at 5. M&K ES realized two days later, on May 18, 2022, that this response was incorrect and that the Benjamin Avenue property was actually transferred on December 28, 2018. *Id.* On May 19, 2022, M&K ES notified Trustees' counsel via email that the original answer was incorrect. *Id.* M&K ES also served the following amended response:

> 16. In January 2019, Chad and Jodi Boucher transferred the Benjamin Avenue Property to M&K Employees.
> **ANSWER**: [M&K ES] denies Request No. 16. Answering further, on December 28, 2018, Chad and Jodi Boucher transferred the Benjamin Avenue Property to M&K [ES]. On January 24, 2019, that transaction was recorded.

*Id.* at 6.

Counsel for Trustees responded to M&K ES by noting that "an admission may only be withdrawn or amended upon order of the [C]ourt" under Federal Rule of Civil Procedure 36(b). Email Thread, Ex. 4.to Defs.' Mot. for Leave, ECF No. 176-5 at 2. Counsel for M&K ES then stated, "[i]f this fact becomes an issue, we will seek leave to amend." *Id.* Five days later, counsel for Trustees deposed Jodi Boucher and asked her a question regarding a quitclaim deed for the Benjamin Avenue property. Defs.' Mot. for Leave at 6–7. Counsel for Trustees expressly

incorporated into his question the date appearing on the quitclaim deed—December 28, 2018. *Id.* at 7.

The Trustees claim in their opposition to the Bouchers' motion for summary judgment that M&K ES's original response establishes that the Benjamin Avenue property was transferred in 2019. Pls.' Opp'n to Bouchers at 18. Because this fact is now "at issue," defendants seek leave to amend their response to RFA No. 16. Defs.' Mot. for Leave at 7. Plaintiffs oppose granting leave. Pls.' Opp'n to Bouchers. A court may grant leave where (1) amendment would promote the presentation of the merits of the action, and (2) amendment would not prejudice the party opposing the motion to amend. *Haynes*, 296 F.R.D. at 13. For the following reasons, the Court will grant M&K ES's motion for leave to amend.

*First*, granting leave would promote presentation of the merits. Although, as the Court explains below, the precise transfer date is not material to the ultimate issue, accurate background information is necessary if the Court is to fully understand all materially relevant events. *See Hollingsworth v. LM Ins. Corp.*, No. 17-cv-494 (TES), 2019 WL 1103414, at *1 n.2 (M.D. Ga. Mar. 8, 2019). The available documentary evidence indicates that the Benjamin Avenue property was in fact transferred on December 28, 2018 under a quitclaim deed. Quitclaim Deed, Ex. 2.to Defs.' Mot. for Leave, ECF No. 176-3 at 2–3. The Court cannot accurately reconstruct the relevant sequence of events pertaining to the Bouchers' and Trustees' claims unless it references the correct date. Moreover, the Court is not comfortable presenting as true factual contentions—even admissions—that lack independent support and are plainly contradicted by the available documentary evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

*Second*, the Trustees will not suffer prejudice because they learned that M&K ES's admission was mistaken a mere two days after it was served, a month before the close of fact

discovery, and several months before the deadline for summary judgment motions. *See Kang Kyu Seo v. Moon Suk Oh*, No. 18-cv-785 (RDM), 2019 WL 4711404, at *4–5 (D.D.C. Sept. 26, 2019). The defendants' corrected response accords with record evidence that was in the Trustees' possession during the deposition of Jodi Boucher. Defs.' Mot. for Leave at 5–7; Quitclaim Deed at 2–3. And even if M&K ES had earlier moved for leave to amend, the Court still would have denied the parties' July 8, 2022 joint request to extend the discovery deadline. *Contra* Pls.' Opp'n to Bouchers at 3–4; *see also* ECF No. 153.

For these reasons, the Court will grant M&K ES leave to amend their response to RFA No. 16. M&K ES's response to RFA No. 16 is deemed amended and the answer served on the Trustees on May 19, 2022 is substituted for their original response. *See* Defs.' Mot. for Leave at 6. The Court will rely on the amended response in deciding the parties' remaining motions.

### B. Motion to Clarify or Reconsider Memorandum Opinion

Defendants ask the Court to clarify or reconsider its February 28, 2022 opinion, *IAM II*, which denied the defendants' earlier motion for partial summary judgment. Only one portion of that opinion is at issue:

> But the evidence on the record and the Trust Agreement indicate that *defendants were in default and the Trustees properly accelerated the withdrawal liability payments*. Defendants may present this argument in arbitration, but it does not entitle them to summary judgment.

*IAM II*, 2022 WL 594539, at *9 (emphasis added) (internal citations omitted). Defendants ask the Court to "clarify" that the Court did not rule on the propriety of accelerated withdrawal liability, or in the alternative, reconsider its opinion. Defs.' Mot. to Clarify at 5–6.

There is nothing for the Court to clarify. The language of the Court's opinion is neither vague nor ambiguous. It makes plain that this Court considered the evidence and conclusively

determined that "defendants were in default and the Trustees properly accelerated the withdrawal liability payments." *IAM II*, 2022 WL 594539, at *9. This is evident from this Court's analysis:

> The Trust Agreement section regarding insecurity default states:
>
>> The Trustees or their designee may also declare an Employer in default in *any circumstances indicating a substantial likelihood that an Employer will be unable to pay its withdrawal liability* such as if the Employer files a petition under the Bankruptcy Code of any similar proceeding under state law, or [the employer] enters into a compromise with creditors, or undergoes a bulk sale, insolvency, or dissolution of a partnership or corporation.
>
>> Defendants argue that they did not default under the specific events listed [under the terms of the Trust Agreement]. But their selective quotations ignore that the list is inclusive. And, as defendants concede, [M&K ES Alsip] informed the Trustees that it was "financially unable to make any payment to the Trustees." The Court finds that is at least arguably a "circumstance indicating a substantial likelihood that [defendants] will be unable to pay [their] withdrawal liability." A reasonable jury could find the default determination proper.

*Id.* at 10 (emphasis added) (internal citations omitted). In other words, the Court reviewed the evidence and applicable law and concluded that the accelerated withdrawal liability was proper. Of course, the Court expressly acknowledged that the defendants could present their arguments to the arbitrator. *Id.* at 9. But that does not change the import of the Court's analysis and conclusion— that "defendants were in default and the Trustees properly accelerated the withdrawal liability payments." *Id.*

The Court sees no reason to reconsider its ruling. Defendants have not shown that the Court patently misunderstood the parties, failed to consider controlling decisions or data, or made a decision beyond the adversarial issues presented. *See Isse*, 544 F. Supp. 2d at 29. Nor have defendants alleged a change in controlling law or new evidence. *See Exxon Mobil*, 2019 WL 2348100, at *3. Defendants argue that the Court rendered its decision before "a complete

evidentiary record had . . . been presented." Defs.' Mot. to Clarify at 7. But defendants point to no new evidence that could alter the Court's analysis. *See id.*; Defs.' Reply to Clarify. The reason for this is simple—the Court's analysis in *IAM II* is complete. As the Court noted, the Trust Agreement provided a non-exhaustive, inclusive list of bases for declaring default. *IAM II*, 2022 WL 594539, at *10. "Any circumstance[] indicating a substantial likelihood" of inability to pay is sufficient to declare default. *Id.* Defendants *conceded* and the Court found that M&K ES Alsip had informed the Trustees that it was financially unable to make any payments. *Id.* Consequently, the Court concluded that the Trustees properly declared the defendants in default. *Id.*

Defendants present no new evidence. Instead, they claim that it is disputed whether Vogel's statement that M&K was unable to pay was "on behalf of the control group M&K Employee Entities or just M&K Employee Solutions, LLC." Defs.' Reply to Clarify at 6. Again, defendants previously conceded that "*[i]n response to a demand from Fund counsel to pay the amount provided in the first Preliminary Injunction Order [ECF 22], M&K Alsip said it was 'financially unable to make any payment to the Trustees*' and offered to provide information to verify the Company's financial condition." ECF No. 102 at 16 n.7 (emphasis added). So, there is no question that Vogel's statement was not made solely on behalf of M&K ES Main. Context is also important. At the time that counsel for defendants sent the letter indicating their inability to pay, the Court had already ordered M&K ES Alsip and its control group members, including M&K ES Joliet, M&K ES Summit, and M&K ES Northern Illinois, to pay the withdrawal liability pending arbitration. ECF No. 22; *see also* ECF No. 102 at 16 n.7. When the Trustees demanded payment pursuant to the Court's order, counsel for all the defendants named in the preliminary injunction stated that "M&K is financially unable to make any payment to the Trustees." M&K Unable to Pay Letter at 2. Counsel's meaning was obvious—the M&K entities that had been ordered to pay

by the Court were unable to pay. *See* M&K Unable to Pay Letter at 2; *see also IAM II*, 2022 WL 594539, at \*9–10. Again, under these circumstances a "reasonable jury could find the default determination proper." *IAM II*, 2022 WL 594539, at \*10. Defendants have produced no new *evidence* that warrants the Court revisiting this issue.[21]

Defendants are displacing their dissatisfaction with the arbitrator's ruling onto the Court. The Court's opinion made clear that defendants were free to raise their arguments concerning accelerated withdrawal liability in arbitration. *Id.* at \*9. That is precisely what defendants did. But perhaps contrary to their expectations, the arbitrator heard their arguments, read this Court's opinion, and reached the same conclusion. *See* Arbitrator's Opinion, Ex. A to Defs.' Mot. to Clarify, ECF No. 182-2 at 9. The arbitrator correctly reasoned that this Court had "ruled on the issue" and that M&K was "seeking another bite at the apple in an alternative forum." *Id.* at 7, 9. The arbitrator saw no need to give defendants another chance to litigate the issue once it had been subjected to the Court's scrutinizing review. The Court declines to give them yet another chance.[22]

## C.  Motions for Summary Judgment

Trustees seek summary judgment in their favor as to Counts I, II, III, IV, VI, VII, VIII, and X. M&K ES seeks summary judgment as to Counts I, II, and III, and the Bouchers seek summary judgment as to Count X. For the reasons that follow, the Court finds that the Trustees are entitled to summary judgment on each count.

---

[21] Defendants pin their hopes on the Court forgetting their previous concession and accepting their new interpretation of the M&K Unable to Pay Letter, *not* on any new evidence. To be clear, even if the Court had not already definitively ruled on this issue and were considering it for the first time, the Court would reach the same result: the accelerated withdrawal liability was proper.

[22] Defendants argue that the procedural posture associated with *IAM II* matters. There, defendants moved for partial summary judgment and the Court ruled against them, finding, based on the *defendants'* evidence, that accelerated withdrawal liability was proper. Plaintiffs had not yet moved for summary judgment, so the Court did not grant them summary judgment. This posture does not therefore mean that the Court's ruling is not the law of the case. *See Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101-02 (D.D.C. 2005).

1. **Count I: M&K ES Alsip and the Remaining M&K ES Entities are Liable for Unpaid Withdrawal Liability, Interest, and Liquidated Damages**

Trustees claim that M&K ES Alsip and the remaining M&K ES entities are liable for unpaid withdrawal liability, interest, and liquidated damages under the MPPAA's "pay now, dispute later" rule. Pls.' MSJ at 30–31. Trustees ask the Court to grant them summary judgment and: (1) award unpaid withdrawal liability, accrued interest, and liquidated damages; (2) rule that payments previously remitted by defendants apply to accrued interest, not unpaid withdrawal liability; and (3) rule that accrued interest is calculated using the 1.5% rate contained in the Second Amendment to the Withdrawal Liability Policy. *Id.* at 30–33.

M&K ES opposes summary judgment for the Trustees on the ground that the parties are still in arbitration and it would be premature to award withdrawal liability, interest, and liquidated damages before arbitration is concluded. M&K ES's Opp'n at 8–10. M&K ES also argues that the Trustees improperly accelerated the withdrawal liability. *Id.* at 10–11. M&K ES asks the Court to grant them summary judgment and: (1) rule that payments previously remitted by M&K ES apply to withdrawal liability principal, not accrued interest; and (2) rule that interest is calculated using the IRS Default Rate. M&K ES's MSJ at 26–32.

### (i) Withdrawal Liability, Interest, and Liquidated Damages

The Court finds that the Trustees are entitled to withdrawal liability, interest, and liquidated damages, despite arbitration still being ongoing.

The MPPAA protects multiemployer pension plans from collapse by requiring employers who withdraw from a plan to pay withdrawal liability. *IAM I*, 2021 WL 1546947, at *8. Congress determined that when an employer disputes the amount of withdrawal liability assessed by a plan, including through arbitration, it must continue paying withdrawal liability pending resolution of that dispute. 29 U.S.C. § 1399(c)(2); *see also IAM I*, 2021 WL 1546947, at *8. This "pay now,

dispute later" regime mitigates the risk that a multiemployer pension plan will collapse when an employer withdraws and contests the amount of withdrawal liability assessed. *IAM I*, 2021 WL 1546947, at *8.

If an employer ignores the "pay now, dispute later" rule and refuses to follow the statutory procedure, its failure to pay is treated as a delinquent contribution and it must pay liquidated damages, interest, costs, and attorneys' fees. 29 U.S.C. §§ 1451(a)–(b), 1145, 1132(g)(2); *see also IAM II*, 2022 WL 594539, at *8. Interest and liquidated damages are mandatory once the Court enters judgment in favor of a benefit plan on the issue of withdrawal liability. *See* 29 U.S.C. § 1132(g); *see also Combs v. Leishman*, 691 F. Supp. 424, 426 (D.D.C. 1988); *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck.*, 870 F.2d 1148, 1156 (7th Cir. 1988); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 179 n.9 (3d Cir. 1999).

The record is clear that defendants were assessed withdrawal liability and failed to make payments within the time prescribed by statute. PSUMF ¶¶ 151–53; DPSUMF ¶¶ 151–53; *see also IAM II*, 2022 WL 594539, at *4. Defendants do not meaningfully contest this. Instead, they contend that judgment is premature because they challenged the withdrawal liability assessment in arbitration and the arbitrator may ultimately rule in their favor. But defendants' position is irreconcilable with the statutory scheme enacted by Congress. By not paying during the pendency of arbitration, defendants violated the "pay now, dispute later" rule. *Id.* at 9. Defendants' willful violation of this rule did not obviate the statutory requirement that they pay *now*. For this simple reason, the Court finds that defendants are liable for unpaid withdrawal liability and must pay any outstanding withdrawal liability immediately.

If defendants ultimately prevail in arbitration, they will be statutorily entitled to recover any amounts paid in excess of the final withdrawal liability amount. *See* 29 U.S.C. § 1401(d). The

statutory provisions governing overpayment are sufficient to protect defendants should they succeed before the arbitrator. *See IAM I*, 2021 WL 1546947, at *19 (citing *IAM Nat'l Pension Fund Benefit Plan A v. Cooper Industries*, 789 F.2d 21, 25 (D.C. Cir. 1986)).

Because the Court has found in favor of Trustees, it must also order defendants to pay interest and liquidated damages. *See* 29 U.S.C. § 1132(g). A potential victory in arbitration cannot excuse defendants from paying these penalties because their purpose is to penalize defendants for failing to comply with the "pay now, dispute later" rule and imperiling the viability of multiemployer pension funds like the Fund. *See IAM II*, 2022 WL 594539, at *8. As the Court previously explained, "even if [M&K ES] is ultimately determined not to owe any withdrawal liability at all," they will still owe interest and liquidated damages. *Id.* at *9 (quoting *Bridge v. Transpersonnel, Inc.*, No. 03-cv-2437 (RRP), 2004 WL 2034075, at *4–6 (N.D. Ill. Sept. 10, 2004)). The Court sees no reason to calculate interest and liquidated damages differently merely because there is a possibility the defendants will prevail in arbitration.

Defendants' last-ditch argument is that the Trustees improperly accelerated withdrawal liability. But as discussed *supra* at III.B, the Court already resolved this issue in *IAM II* in favor of the Trustees. The Court will not reconsider its earlier ruling.

Additionally, the Court has already indicated, and the defendants do not dispute, that M&K ES Main, M&K Illinois Leasing, M&K ES Joliet, M&K ES Summit, and M&K ES Northern Illinois are trades or businesses under common control with M&K ES Alsip. *See IAM I*, 2021 WL 1546947, at *6; M&K Sales's Opp'n at 9–21. Each entity was owned entirely by the Bouchers as of December 31, 2018. *Id.*; *see also* PSUMF ¶ 82; DPSUMF ¶ 82. As a result, each entity is jointly and severally liable with M&K ES Alsip and the Trustees are entitled to summary

judgment on Count II. 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-2(c); *accord Connors v. Incoal, Inc.*, 995 F.2d 245, 249 (D.C. Cir. 1993).

All that remains for the Court to decide is whether payments previously remitted by defendants apply to accrued interest or the principal withdrawal liability amount, and whether accrued interest is calculated using the 1.5% rate contained in the Second Amendment to the Withdrawal Liability Policy or the IRS Default Rate.

### (ii) Effect of Prior Payments on Principal Withdrawal Liability Amount

Trustees argue that M&K ES's payments totaling $1,797,781 should be credited first toward accrued interest, and then the principal amount of unpaid withdrawal liability. Pls.' MSJ at 31–32. If the Trustees are correct, then because the amount of accrued interest exceeds the total payments already remitted by the fund, M&K ES still owes the full amount of withdrawal liability—$6,078,739. *Id.* at 32; Pls.' Reply at 9–10. M&K ES disagrees. M&K Sales's Opp'n at 13–16; M&K ES's MSJ at 26–28.

Both parties acknowledge that the issue turns on whether the Court should apply the "United States Rule" as defined in *Chi. Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. El Paso CGO Co.*, 525 F.3d 591, 604–05 (7th Cir. 2008). Pls.' MSJ at 31–32; M&K ES's MSJ at 26–28. Under the federal common-law "United States Rule," payments are first applied to accrued interest and then to principal. *Chi. Truck Drivers*, 525 F.3d at 604. The United States Rule "applies in the absence of 'a clearly expressed intention' by the parties to allocate payments in some other way," and it "does not permit [a] debtor unilaterally to allocate payments to principal rather than interest." *Id.* (quoting *S. Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1088 n.11 (5th Cir. 1986)).

The question the Court must decide is whether there was a clearly expressed intention by the parties to allocate M&K ES's previous payments to principal instead of accrued interest. The arbitrator took a first stab at deciding this question and ultimately sided with defendants based on the cumulative weight of the evidence, although he conceded that some would "view [his] conclusion as a 'stretch.'" ECF No. 188-1 at 12–13.

The Court assumes without deciding that the arbitrator had jurisdiction to decide this question. *See* ECF No. 189 at 2 (arguing that the arbitrator "never had jurisdiction to decide the issue"). Instead, the Court will focus on whether the evidence in the record is legally sufficient to establish a "clearly expressed intention" to overcome the United States Rule and allocate payments to accrued interest. *See IAM Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n.7 (D.C. Cir. 1984) ("Under MPPAA . . . the decisions of the arbitrator . . . are fully reviewable to determine whether applicable statutory law has correctly been applied and whether the findings comport with the evidence."); *see also United Mine Workers of Am. 1974 Pension Plan v. Energy West Mining Co.*, 39 F.4th 730, 737 (D.C. Cir. 2022). Absent legally sufficient evidence to overcome default application of the United States Rule, the Trustees are entitled to summary judgment that the United States Rule applies.

This is an issue of first impression in this Circuit. There is decidedly little case law applying the United States Rule to withdrawal liability under ERISA, let alone explaining how to identify a "clearly expressed intention" to apply payments contrary to the rule. Two factors appear to determine the parties' intentions most directly: (1) whether a court ordered that payments would apply to principal; and (2) the existence of a contractual agreement between the parties. *See Devex Corp. v. General Motors Corp.*, 749 F.2d 1020, 1025 (3d Cir. 1984) (emphasizing the existence

of a court order); *Nat G. Harrison Overseas Corp. v. Am. Barge Sun Coaster*, 475 F.2d 504, 507 (5th Cir. 1973) (emphasizing contractual arrangements between the parties).

Also important is that the MPPAA "be broadly construed to effectuate its remedial purposes, which are to protect plan participants and the solvency of pension funds." *Chi. Truck Drivers*, 525 F.3d at 605. The United States Rule "encourages employers to pay the [withdrawal liability] balance in full" and "comports with the remedial goals of the statute." *Id.* Because the United States Rule comports with the goals of the MPPAA, it should not be lightly discarded. *See id.* In the Court's view, this sets a high legal bar before finding the rule obviated. Otherwise, the requirement that there be a "clearly expressed intention" has no bite, and the United States Rule will give way too easily in cases where applying the rule is the best means of serving Congress's goals. *Cf. IAM II*, 2022 WL 594539, at *8.

Thus, to establish a clearly expressed intention to allocate payments contrary to the United States Rule, M&K ES must show either that the Court understood that payments would be applied to principal, in which case the Court will hew to its earlier understanding, or that the parties entered into a contractual (or substantially similar) agreement to apply payments to principal. This standard reflects the Court's duty to apply the United States Rule (and exceptions to it) in service of the remedial goals of the MPPAA.

The Court now applies that test to the undisputed facts and finds that the record evidence is legally insufficient to establish a clearly expressed intention to deviate from the United States Rule. Because the evidence is legally insufficient to establish intent to deviate from the United States Rule, the United States Rule applies, and the Trustees are entitled to summary judgment. *See Chi. Truck Drivers*, 525 F.3d at 604. The arbitrator's award cannot govern the Court's

disposition of this issue because it is incorrect as a matter of law. *See United Mine Workers*, 39 F.4th at 737.

*First*, the Court did not understand that M&K ES's payments were made toward the principal amount owed. The Court in *IAM II* stated that "[w]hen combined with small payments [M&K ES] had made in the past, this [most recent] payment meant the defendants had now paid *the amount of* the recalculated principal withdrawal liability in full." 2022 WL 594539, at *4 (emphasis added). The Court did not state that defendants had paid principal withdrawal liability in full, only that defendants had paid an *amount* equivalent to the recalculated principal withdrawal liability. *Id.* Had the Court taken M&K ES's position, it would have done so expressly, and not in a single sentence in the procedural history section of its opinion. The Court said what it said only because it was a true description of the record; M&K ES had made total payments equaling the dollar amount of the recalculated withdrawal liability. That does not mean the Court understood that the parties had agreed to apply the amount paid to principal instead of accrued interest.

*Devex Corp.* is instructive. There, the parties agreed and the Court *ordered* that the defendant's first payment would apply to principal rather than interest. *Devex Corp.*, 749 F.2d at 1025. The Court agrees with the Third Circuit that a court order can establish a clearly expressed intention to depart from the United States Rule. *But see id.* at 1027 (Gibbons, J., dissenting). But a single carefully qualified sentence in the background section of an opinion that does not even broach the question of how payments will be applied is patently insufficient. *See IAM II*, 2022 WL 594539, at *4, *7–9. Thus, to prevail, M&K ES must be able to point to a contractual (or substantially similar) agreement between the parties to deviate from the rule.

*Second*, the parties did not reach a contractual (or substantially similar) agreement to deviate from the United States Rule. M&K ES points to a letter in which the Trustees stated:

> Petitioner's recalculated withdrawal liability is $1,797,781, and as a
> result of the Fund's September 10, 2020 acceleration of the liability,
> $1,786,294—the entire amount of the recalculated liability, less the
> $11,487 in interim payments made to date—is due immediately.

DSUMF ¶ 88; PDSUMF ¶ 88. According to M&K ES, when the Trustees demanded immediate payment of $1,786,294, they expressed their intention to apply that amount to principal, because it reflected the difference between the total recalculated withdrawal liability and M&K ES's earlier $11,487 payment. M&K ES's MSJ at 27. But that does not clearly evince intent by the Trustees to apply the amount requested to principal *instead of accrued interest that the Court had not yet awarded*. At most, it constituted an attempt to collect money from a party that until that point had obstinately refused to make any substantial payments. Besides, the Trustees' letter clearly does not constitute a contract or anything even remotely similar. *Cf. Nat G. Harrison Overseas*, 475 F.2d at 507. M&K ES owed unpaid withdrawal liability; that has been the Trustees' position throughout this litigation. The Trustees demanded payment from M&K ES in absolute terms. The Trustees did not intimate a compromise, such as a proposal to apply payments to principal if M&K ES agreed to pay promptly the sum demanded. If that was the parties' intention, they should have memorialized it in an agreement and presented that agreement to the Court.

If the Court were to deem the letter proffered by M&K ES legally sufficient to establish a clearly expressed intention to deviate from the United States Rule, it would severely undermine the effectiveness of the United States Rule in ensuring compliance with the "pay now, dispute later" regime. *See Chi. Truck Drivers*, 525 F.3d at 605. These facts are far too bare to find a "clearly expressed intention" in light of the broader context in which the Court must interpret and apply the United States Rule. *See id.* Indeed, they are legally insufficient to establish the requisite intent.

The Court cannot countenance deviating from the United States Rule on such thin facts when doing so would undermine the remedial regime the rule is supposed to serve.[23] *See id.*

Finally, M&K ES argues that Section 1451(b) of ERISA requires the Trustees to treat calculations of liability for delinquent contributions and withdrawal liability the same. M&K Sales's Opp'n at 15–16. Under the Fund's Contributions Policy, amounts paid for delinquent contributions are credited toward principal first. Contributions Policy at 3. But that is not what Section 1451(b) requires. Section 1451(b) effectively copies the enforcement mechanisms for delinquent contributions and applies them to unpaid withdrawal liability. *See Carpenters Pension Tr. Fund v. Moxley*, 734 F.3d 864, 879 (9th Cir. 2013). It does not require that delinquent contributions and withdrawal liability be calculated the same way, because they are not "otherwise similar obligations." *See id.* M&K ES points to no authority supporting its position.

For these reasons, M&K ES Alsip and the other M&K ES entities owe the full amount of unpaid principal withdrawal liability. That amount is $6,078,739—the amount assessed by Trustees after the Court vacated the arbitrator's award. PDSUMF ¶ 162.

### (iii) Interest Rate

Trustees allege that M&K ES Alsip owes interest at the rate of 1.5% per month on $6,158,482 in withdrawal liability from August 13, 2019 to July 13, 2021, $1,797,781 in recalculated liability from July 14, 2021 to October 24, 2022, and $6,078,739 in recalculated liability from October 25, 2022 to present. *See* Pls.' Opp'n to M&K ES at 22; Pls.' MSJ at 32. M&K ES opposes on two grounds: (1) interest should be calculated based on the amount of withdrawal liability ultimately determined in arbitration and not the amounts assessed by the

---

[23] The arbitrator thought it significant that the Trustees' First Amended Rule 26(A)(1) Initial Disclosures expressly identified $1,786,294 as "Principal." ECF No. 188-1 at 12. But as the Court has explained, merely labeling an amount of money "principal" or "recalculated liability" does not constitute a "clearly expressed intention" to deviate from the United States Rule. Absent a court order or contractual agreement to deviate, the United States Rule applies.

Trustees; and (2) the correct interest rate is the IRS Default Rate, not 1.5%. M&K Sales's Opp'n at 23, 31. The Court finds that accrued interest should be calculated using the amounts assessed by the Trustees and applying the 1.5% rate contained in the Second Amendment to the Withdrawal Liability Policy.

*First*, the law is clear that "a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability *from the due date of the first payment which was not timely made*." 29 U.S.C. § 1399(c)(5) (emphasis added); 29 C.F.R. § 4219.32(d)–(e). Defendants failed to make any payments before August 13, 2019 (the date on which the first quarterly installment payment was due), so that is the date interest started accruing. PSUMF ¶¶ 151–53; DPSUMF ¶¶ 151–53. Additionally, interest is due "on the total outstanding liability." 29 U.S.C. § 1399(c)(5). The Court has already established that "total outstanding liability" corresponds to the amounts assessed by the Trustees until those amounts are overturned. *See IAM II*, 2022 WL 594539, at *7–9. This is true because otherwise the "pay now, dispute later" rule would lack bite, as employers could escape penalty for violating "pay now, dispute later" by prevailing in arbitration. *See id.* at 8. Tying interest and liquidated damages to the amounts assessed by the plan—until those amounts are reduced or overturned—furthers Congress's purpose in enacting the MPPAA by encouraging compliance with the rule. *See id.*

M&K ES argues that the April 2021 Injunction established that the Trustees are not entitled to interest and liquidated damages based on the Trustees' assessments. M&K ES's MSJ at 22–23. But that is not what the April 2021 Injunction said. The April 2021 Injunction distinguished withdrawal liability from interest and liquidated damages for the limited purpose of determining whether the Trustees would suffer irreparable harm absent preliminary relief. *IAM I*,

2021 WL 1546947, at *10. The Court reasoned that they would not. *Id.* The Court's discussion of safeguards did not implicate the manner in which interest or liquidated damages are calculated. *Id.* *IAM II*, in contrast, established that interest is due on amounts assessed by the Trustees until those amounts are overturned. *See* 2022 WL 594539, at *7–9.

*Second*, the 1.5% interest rate is proper because M&K ES Alsip agreed to be bound by retroactive amendments to the Trust Agreement including the Second Amendment to the Withdrawal Liability Policy. M&K ES is correct that the Trust Agreement originally set the interest rate equal to the IRS Default Rate. Trust Agreement at 27; Withdrawal Liability Policy at 5. But M&K ES Alsip also agreed to be bound to the Trust Agreement "as currently in effect and as the Trust Plan may be amended from time to time." M&K ES Alsip CBA at 14. The Trust Agreement expressly allows for retroactive amendment:

> This Restated Trust Agreement may be amended in any respect from time to time by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees. *As to any amendment, the Trustees in their discretion shall have full power to fix the effective date thereof. Any amendment may have retroactive effect if it is so determined by the Trustees.*

Trust Agreement at 33 (emphasis added). On April 7, 2021, the Trustees amended the Trust Agreement to retroactively apply a 1.5% interest rate. Withdrawal Liability Policy at 11. On its face, M&K ES Alsip agreed to be bound by retroactive amendments to the Trust Agreement. Trust Agreement at 33. There is no provision limiting the scope of such amendments or preventing the Trustees from amending the interest rate applied to unpaid withdrawal liability. *Id.* So, M&K ES Alsip is bound by the revised interest rate. *See Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc.*, No. 17-cv-1215 (TNM), 2019 WL 4346325, at *10 & n.7 (D.D.C. Sept. 12, 2019).

49

M&K ES argues that it is not bound by retroactive amendments to the Trust Agreement because it terminated the CBA before the amendment was signed and entered. M&K ES's MSJ at 29–30. M&K ES relies on two decisions from outside this Circuit—*Chi. Area Int'l Bhd. Of Teamsters Health & Welfare Tr. Fund v. Thomas S. Zaccone Wholesale Produce, Inc.*, 874 F. Supp. 188 (N.D. Ill. 1995), and *32BJ North Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93 (2d Cir. 2019). These decisions are inapposite. In both cases the employers never expressly agreed to be bound by a trust agreement containing a retroactive amendment clause, let alone any trust agreement. *Zaccone*, 874 F. Supp. at 192; *32BJ North*, 935 F.3d at 101–02. Here, M&K ES Alsip expressly agreed to be bound by a trust agreement *containing a provision allowing for retroactive amendment*. The Court finds the plain language of the Trust Agreement sufficient to rule in the Trustees' favor.

Additionally, although M&K ES Alsip's obligation to contribute to the Fund under the CBA terminated after December 31, 2018, M&K ES Alsip was still obligated to pay withdrawal liability under the terms of the Trust Agreement. The Fund issued the unamended Withdrawal Liability Policy before M&K ES Alsip terminated the CBA. *See* Withdrawal Liability Policy at 8 (showing the policy was signed December 5, 2018). M&K ES Alsip was bound by the unamended policy and does not argue that its obligations under it ceased once it terminated the CBA. Indeed, given the nature of withdrawal liability, the policy's provisions only could have sprung into life *after* M&K ES Alsip terminated its contribution obligations and completely withdrew from the Fund. *See id.* at 2 ("Trustees . . . adopt[] the following policy . . . for assessing liability against an employer that *experiences a complete or partial withdrawal* from the Fund.") (emphasis added); *see also* 29 U.S.C. § 1381. So, M&K ES Alsip retained at least some contractual obligations to the Fund after December 31, 2018—i.e., to pay any withdrawal liability in conformity with the terms

of the Trust Agreement as embodied in the Withdrawal Liability Policy—and those obligations sprang from the Trust Agreement.

To summarize, all of M&K ES Alsip's legal obligations to the Fund via the Trust Agreement did not cease merely because its duty to contribute under the CBA had ceased; M&K ES Alsip retained obligations relating to withdrawal liability. The Trustees retroactively modified those surviving obligations pursuant to the retroactive amendment clause in the Trust Agreement.[24] M&K ES Alsip failed to properly discharge those obligations because it brazenly disregarded the "pay now, dispute later" scheme. The Court cannot emphasize enough that it is M&K ES's own unlawful actions that have prolonged its legal entanglement with the Fund. The Court is unwilling to ignore the plain language of the Trust Agreement to rescue defendants. *See* M&K Sales's Opp'n at 20 (explaining that M&K ES Alsip relied upon the previous rate when deciding not to conform with "pay now, dispute later").

Moreover, 1.5% is fair and reasonable. *See* Trust Agreement at 22 (applying 1.5% interest rate to delinquent contributions); *see also ITPE Pension Fund v. Stronghold Sec., LLC*, 23 F. Supp. 3d 1, 8 (D.D.C. 2014) (awarding 1.5% interest rate on delinquent contributions). And allowing retroactive amendment under these circumstances is consistent with Congress's intent to utilize interest to penalize employers who violate "pay now, dispute later." *See IAM II*, 2022 WL 594539, at *8. Under these circumstances, the Trustees' retroactive interest rate amendment was proper.

Finally, the Court finds no merit in M&K ES's suggestion that the Pension Benefit Guaranty Corporation (the "PBGC") was required to approve the Trustees' amendment under

---

[24] Again, M&K ES Alsip agreed to be bound by the Trust Agreement. M&K ES Alsip CBA at 14. The Withdrawal Liability Policy is a duly promulgated extension of the Trust Agreement. Trust Agreement at 18.

29 U.S.C. § 1400(a). *Contra* M&K ES's MSJ at 30 n.7. This section does not apply to plans or amendments authorized under 29 U.S.C. §§ 1381–1399. PBGC Notice, 48 Fed. Reg. 19807-01 (May 2, 1983), *available at* 1983 WL 123453. M&K ES understandably dropped this argument in their reply. *See* M&K ES's Reply. For the same reason, M&K ES is not entitled to reopen discovery.[25]

* * *

The Court finds that the Trustees are entitled to, and M&K ES Alsip and the remaining M&K ES entities owe: (1) $6,078,739 in unpaid withdrawal liability; (2) interest calculated at the rate of 1.5% per month on $6,158,482 in withdrawal liability from August 13, 2019 to July 13, 2021, $1,797,781 in recalculated liability from July 14, 2021 to October 24, 2022, and $6,078,739 in recalculated liability from October 25, 2022 to present, less any payments previously remitted by M&K ES Alsip and the remaining M&K ES entities; and (3) liquidated damages at an amount equal to the greater of (i) the amount of accrued interest or (ii) 20% of $6,078,739. 29 U.S.C. § 1132(g)(2).

### 2. Count III: M&K ES Summit and the Remaining M&K ES Entities are Liable for Delinquent Contributions, Interest, and Liquidated Damages

Trustees claim that M&K ES Summit and the remaining M&K ES entities owe delinquent contributions for work performed by M&K ES Northern Illinois employees at M&K Sales Northern Illinois. Pls.' MSJ at 38–41. The Trustees' theory is that M&K ES Summit and M&K ES Northern Illinois constituted a "single employer" and that therefore M&K ES Summit owes contributions for M&K ES Northern Illinois employees under the M&K ES Summit CBA. *Id.*

---

[25] The Trustees' reasons for amending the interest rate are immaterial. Defendants offer no reason to think otherwise.

Trustees ask the Court to grant them summary judgment and award delinquent contributions, interest, and liquidated damages. *Id.* at 41.

M&K ES opposes summary judgment for the Trustees on the ground that the Trustees failed to properly plead the single employer theory prior to filing their motion for summary judgment. M&K ES's Opp'n at 21–23. M&K ES also contends that the record does not support a finding of single employer status. *Id.* at 23—37. M&K ES asks the Court to grant them summary judgment and find that the Trustees are not entitled to any outstanding contributions. M&K ES's MSJ at 32–41.

### (i)  Sufficiency of Pleading

M&K ES argues that the single employer theory asserted in the Trustees' motion for summary judgment is not asserted in the Trustees' Fifth Amended Complaint and therefore is waived. M&K ES's Opp'n at 21–23.

M&K ES's view is that the Trustees' single employer theory constitutes a "fundamental change" from the contractual theory of liability pleaded in their complaint. *Id.* at 21 (quoting *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 41 (D.D.C. 2010)). However, the Court finds that the complaint provided M&K ES with adequate notice that the Trustees were pursuing delinquent contributions from M&K ES Summit on the theory that M&K ES Summit and M&K ES Northern Illinois were a single employer. *See* Fifth Am. Compl. ¶¶ 62–67. For this reason, M&K ES's pleading argument fails.

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he pleadings must 'give the defendants fair notice of what the claim is and the grounds upon which it rests,' but the Rule 'does not require detailed factual allegations.'" *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint "must be construed so as to do justice." Fed. R. Civ. P. 8(e).

M&K ES's argument elides the fact that the Trustees' single employer theory is part and parcel of their contractual claim. The Trustees' position is that M&K ES Summit is liable for contributions for M&K ES Northern Illinois employees *under the terms of the M&K ES Summit CBA* because both entities constituted a single employer. Pls.' MSJ at 38. While the Trustees may not have spelled out the facts underlying their single employer theory under Count III, the Trustees did expressly allege elsewhere in the complaint that "M&K Employees and M&K Sales constituted a functionally integrated enterprise" and "at all relevant times . . . shared common ownership, facilities, equipment, personnel, management, customers, and centralized control over labor relations." Fifth Am. Compl. ¶ 67. These allegations (on which the Trustees now rely in their motion for summary judgment) were sufficient to put M&K ES on notice that the Trustees were pursuing a single employer theory as between M&K ES Summit and M&K ES Northern Illinois, even though the complaint generally emphasized single employer status between M&K ES and M&K Sales entities. *See Brown v. District of Columbia*, No. 14-cv-750 (RC), 2022 WL 103304, at *11 (D.D.C. Jan. 11, 2022). In other words, the Trustees' theory "is well within the contours of the complaint." *Id.*

M&K ES's protestations regarding discovery are unavailing. The Trustees objected to one of defendants' requests for production by stating that this Court's review was limited to "whether M&K [ES Summit] is obligated to pay contributions for work performed at the M&K [ES] Northern Illinois facility." M&K ES's Opp'n at 22. But again, that is precisely what the Trustees ask the Court to determine in their motion for summary judgment. Pls.' MSJ at 40–41. The

Trustees' response did not disclaim a single employer explanation for *why* M&K ES Summit is obligated under its CBA, M&K ES's Opp'n at 22, and the Trustees' current motion does not constitute a fundamental shift from that response, *see Brown*, 2022 WL 103304, at *11.

M&K ES also points to the Trustees' response to its request that the Trustees identify any documents requiring M&K ES Summit to make contributions for employees working at M&K Sales Northern Illinois. M&K ES's Opp'n at 22. The Trustees responded by directing them to the M&K ES Summit CBA. *Id.* M&K ES is unhappy that the Trustees did not direct them to other documents they now cite in their motion for summary judgment, such as the ASAs. *Id.* at 23. But these other documents were non-responsive to M&K ES's request. *Only* the M&K ES Summit CBA *required* M&K ES Summit to remit contributions; the other documents M&K ES references (and that the Trustees cite) establish only that M&K ES Summit and M&K ES Northern Illinois constitute a single employer. *See Bd. of Trs., Sheet Metal Workers' Loc. Union 102 Health Benefit Fund v. Gibson Bros.*, No. 820329, 1982 WL 2079, at *3 (D.D.C. Oct. 27, 1982). The contribution requirement itself stems from the CBA. And in any event, M&K ES was already in possession of all the documents that the Trustees now cite.

The Trustees do "not seek to rely on wholly different arguments" than those in their complaint and they have not sought to cure pleading defects via summary judgment briefing. *See Brown*, 2022 WL 103304, at *11. For these reasons, the Court finds that the Trustees' single employer theory of liability is not waived. All that remains for the Court to decide is whether M&K ES Summit and M&K ES Northern Illinois constituted a single employer.

### (ii) Single Employer Status

"To determine whether two nominally separate business entities are a single employer, one must examine four factors set out by the Supreme Court: (1) interrelation of operations, (2)

common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wis. & Its Loc. 5*, 724 F.3d 939, 946 (7th Cir. 2013) (quoting *Trs. of Pension, Welfare, and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co. Inc.*, 995 F.2d 785, 788 (7th Cir. 1993)). "No one of these factors is conclusive; instead, the decisionmaker must weigh the totality of the circumstances." *Id.* at 946–47. "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Id.* at 947 (quoting *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996)).

The Court concludes that M&K ES Summit and M&K ES Northern Illinois constituted a single employer.

*First*, the operations of M&K ES Summit and M&K ES Northern Illinois were "extensively interrelated." *Id.* "When analyzing the interrelation of operations, it is the day-to-day operational matters that are the most relevant." *Id.* (internal quotation marks omitted). In *Lippert Tile*, the court found it significant that the "same entity" maintained business records, processed payroll, handled billing, and managed bank accounts, because these "daily operations are critical to the smooth functioning of . . . both companies' work." *Id.* So too here. All M&K ES entity personnel records, including records for M&K ES Northern Illinois and M&K ES Summit, were maintained at the M&K Sales Summit dealership location. PSUMF ¶¶ 78, 112; DPSUMF ¶¶ 78, 112. Schneider and Milarg, both of whom were M&K ES Summit employees, managed payroll, billing, and bank accounts for both M&K ES Summit and M&K ES Northern Illinois. PSUMF ¶ 111; DPSUMF ¶ 111.

Additionally, both M&K ES Summit and M&K ES Northern Illinois were owned by the same people, operated as part of the same organizational structure, and served the same clients in

the same geographical area subject to identical ASAs. *E.g.*, PSUMF ¶¶ 35, 38, 53–55, 81–82; DPSUMF ¶¶ 35, 38, 53–55, 81–82. Both M&K ES Summit and M&K ES Northern Illinois were overseen by the same Regional Vice President of Operations, Waters, who himself was an employee of M&K ES Northern Illinois. PSUMF ¶ 108; DPSUMF ¶ 108. Both entities shared the same head of human resources, LaJeunesse, who himself was an employee of M&K ES Summit. PSUMF ¶ 110; DPSUMF ¶ 110. Both entities received legal and accounting services from Mika Meyers and Crowe. PSUMF ¶¶ 94, 101; DPSUMF ¶¶ 94, 101. And the general managers of M&K ES Summit and M&K ES Northern Illinois were both accountable to Pilecki. PSUMF ¶¶ 68, 83–85; DPSUMF ¶¶ 68, 83–85. As in *Lippert Title*, these facts are sufficient to establish that the operations of these entities were "extensively interrelated if not intertwined." *See* 724 F.3d at 947.

*Second*, M&K ES Summit and M&K ES Northern Illinois shared common management. Although both entities had separate general managers who were responsible for interviewing and hiring subordinate employees, the general managers for both entities were approved and hired by Pilecki. PSUMF ¶¶ 68, 83–84; DPSUMF ¶¶ 68, 83–84. Pilecki retained discretion to hire and fire employees, and LaJeunesse kept Pilecki informed "of all hiring and firing decisions of M&K ES employees, grievances, and workers' compensation claims." PSUMF ¶¶ 84, 87; DPSUMF ¶¶ 84, 87. Pilecki in turn conducted general managers' performance reviews, set their compensation, and determined when they could step away from work. PSUMF ¶ 85; DPSUMF ¶ 85. For several months the M&K ES Summit and M&K ES Northern Illinois general managers were also both overseen by Waters. PSUMF ¶ 108; DPSUMF ¶ 108. And Wilkey supervised two M&K ES Summit employees while they worked out of the M&K ES Northern Illinois location. PSUMF ¶ 109; DPSUMF ¶ 109. Although as a general matter it appears that subordinate M&K ES employee assignments and discipline were given by or issued by other M&K ES employees from

the same location (i.e., their general managers), the other facts cited by the Court are sufficient to establish common management. DSUMF ¶¶ 36–37; PDSUMF ¶¶ 36–37.

*Third*, M&K ES Summit's owner, Jansma, exercised centralized control over labor relations because she created a new entity, M&K ES Northern Illinois, which performed the exact same work that was performed at M&K Sales Summit, except using non-union labor. PSUMF ¶ 105–06; DPSUMF ¶ 105–06. M&K ES argues that M&K ES Northern Illinois was formed to hire employees from an existing non-union dealership and not to divert work from M&K ES Summit. However, the decision to create a new M&K ES entity, instead of hiring the employees into M&K ES Summit directly, all but ensured that the newly-hired employees would be shut out of the M&K ES Summit CBA entirely. It also denied to existing M&K ES Summit employees the benefit of an additional dealership that would remit contributions to the Fund for covered work— something the CBA obviously had anticipated. *Cf. Lippert Tile*, 724 F.3d at 947. Additionally, as the Court has already discussed, employees at both entities were required to abide by the same employee handbook and ASAs, and their personnel files were stored in the same locations. PSUMF ¶¶ 53–54, 70–71, 112; DPSUMF ¶¶ 53–54, 70–71. 112. The general managers for each entity were supervised by and directly accountable to Pilecki. PSUMF ¶ 85; DPSUMF ¶ 85. And the personnel who handled payroll for both entities were both employed at M&K ES Summit. PSUMF ¶ 111; DPSUMF ¶ 111. So, there was in fact centralized control over labor.

*Fourth*, there is no question that there was common ownership.[26] PSUMF ¶¶ 80–81; DPSUMF ¶¶ 80–81.

---

[26] Defendants repeatedly point out that the M&K ES entities were organized as separate Series LLCs. DSUMF ¶¶ 8–9, 23; PDSUMF ¶¶ 8–9, 23. But the purpose of single employer liability is "to ignore separate corporate charters and to find that one corporation is actually and equitably liable in the same manner and to the same extent as the express contractual signatory to an agreement." *Gibson Bros.*, 1982 WL 2079, at *3–4. So, it does not matter that the M&K ES entities were separate Series LLCs. If they constitute single employers, it is "appropriate and equitable" to treat them as such. *Id.*

Having considered these four factors, the Court finds that both M&K ES Summit and M&K ES Northern Illinois constituted a single employer. Because M&K ES Summit and M&K ES Northern Illinois constituted a single employer, M&K ES Northern Illinois is bound by M&K ES Summit's CBA. *See Gibson Bros.*, 1982 WL 2079, at \*3–4; *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp. 2d 60, 62 (D.D.C. 2001).

The plain meaning of the M&K ES Summit CBA supports this result. The M&K ES Summit CBA extended to covered work performed at "any additional facilities opened during the term of this agreement in McHenry, Lake, *Cook*, DuPage, Kane, and Will Counties." M&K ES Summit CBA at 3 (emphasis added). M&K ES Northern Illinois was formed to provide employees for M&K Sales Northern Illinois, which is located in Cook County. DSUMF ¶¶ 21–22; PDSUMF ¶¶ 21–22. M&K Sales Northern Illinois was formed subsequently to M&K ES Summit entering the CBA. DSUMF ¶¶ 20, 123; PDSUMF ¶¶ 20, 123. It therefore follows that M&K Sales Northern Illinois was an additional facility opened during the term of the M&K ES Summit CBA.

It does not matter that M&K Sales Northern Illinois was not opened by M&K ES Summit. This makes sense when one considers how defendants characterize their respective business purposes. According to defendants, the M&K ES entities were in the business of leasing labor, and the M&K Sales entities were in the business of operating truck dealerships. DSUMF ¶¶ 57–58. If the M&K ES Summit CBA extended only to facilities opened by M&K ES Summit, then the additional facility provision would have little meaning, because M&K ES Summit purportedly was not in the business of opening facilities, let alone operating them, and the parties to the CBA therefore could never have reasonably expected this to occur. Assuming that was the parties' understanding, the additional facility clause is non-superfluous only if the identity of the facility-opener is irrelevant.

Finally, the Court is not convinced that there is any significance to the Union's failure to successfully organize workers at M&K ES Northern Illinois or assign it an employer I.D. code. DSUMF ¶¶ 19, 30; PDSUMF ¶¶ 19, 30. It suffices for liability under the M&K ES Summit CBA that M&K ES Summit and M&K ES Northern Illinois constituted a single employer.

\* \* \*

The Court finds that the Trustees are entitled to, and M&K ES Summit owes: (1) $442,556.40 in delinquent contributions; (2) interest calculated at the rate of 1.5% per month from the month after which the covered work was performed; and (3) liquidated damages at an amount equal to the greater of (i) the amount of accrued interest or (ii) 20% of $442,556.40. 29 U.S.C. § 1132(g)(2). As the Court has already held, M&K ES Main, M&K Illinois Leasing, M&K ES Joliet, M&K ES Summit, and M&K ES Northern Illinois are trades or businesses under common control with M&K ES Alsip. As a result, each entity is jointly and severally liable with M&K ES Summit.

### 3. Counts IV & VI: Each M&K Sales Entity is Jointly and Severally Liable with Its Corresponding M&K ES Entity as a Single Employer or Alter Ego

Trustees claim that each M&K Sales entity is jointly and severally liable for the withdrawal liability and delinquent contributions of its corresponding M&K ES entity. Pls.' MSJ at 41–50. The Trustees' theory is that each M&K Sales entity constituted a "single employer" or "alter ego" of its corresponding M&K ES entity. *Id.* Trustees ask the Court to grant them summary judgment and find the M&K Sales entities jointly and severally liable with the M&K ES entities. *Id.* at 42. M&K Sales opposes. M&K Sales's Opp'n at 15–25.

#### (i) Single Employer Status

The Court concludes that each M&K Sales entity constituted a single employer with its corresponding M&K ES entity.

To determine single employer status, the Court must consider the same factors that it weighed when it concluded that M&K ES Summit and M&K ES Northern Illinois constituted a single employer. Those factors are: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile*, 724 F.3d at 946.

*First*, the operations of each M&K ES and M&K Sales entity were "extensively interrelated." *Id.* at 947. As the Court has already noted, "[w]hen analyzing the interrelation of operations, it is the day-to-day operational matters that are the most relevant." *Id.* This factor is not even close. M&K ES employees operated the M&K Sales dealerships *in toto*. *See* PSUMF ¶ 58; DPSUMF ¶ 58. With only temporary and indeterminate exceptions, all M&K Sales employees were leased from M&K ES. PSUMF ¶¶ 52–55; DPSUMF ¶¶ 52–55. M&K ES *only* leased employees to M&K Sales. PSUMF ¶ 55; DPSUMF ¶ 55. M&K Sales reimbursed M&K ES for "all costs actually incurred" in connection with those employees. PSUMF ¶ 59; DPSUMF ¶ 59; DSUMF ¶ 50. M&K ES did not own or lease any office space or equipment. PSUMF ¶ 72; DPSUMF ¶ 72. All M&K ES employees performed their work at M&K Sales dealerships using equipment provided by M&K Sales or personal tools stored at M&K Sales locations. PSUMF ¶¶ 73, 76; DPSUMF ¶¶ 73, 76. And all M&K ES employees used M&K Sales email accounts and communications systems. PSUMF ¶ 77; DPSUMF ¶ 77. These facts decisively establish interrelationship of operations between the corresponding M&K ES and M&K Sales entities.

*Second*, each M&K ES and corresponding M&K Sales entity shared common management. M&K Sales had no employees of its own; M&K ES employees operated each M&K Sales location and performed all labor, operational, administrative, financial, accounting, and legal services. PSUMF ¶¶ 52, 58; DPSUMF ¶¶ 52, 58. M&K ES provided managerial services for M&K Sales as each M&K Sales location was managed by an M&K ES general manager. PSUMF ¶¶ 68, 83,

85; DPSUMF ¶¶ 68, 83, 85. Thus, there was no daylight between the M&K ES and M&K Sales entities concerning day-to-day management. Moreover, the general managers for each M&K Sales location were hired by Meyering and Pilecki and reported to Pilecki. PSUMF ¶¶ 68, 83, 85; DPSUMF ¶¶ 68, 83, 85. Both Meyering and Pilecki served as officers of M&K Sales and exercised control over the general managers. PSUMF ¶¶ 44–47, 68, 83, 85; DPSUMF ¶¶ 44–47, 68, 83, 85. Again, these facts decisively establish common management between the corresponding M&K ES and M&K Sales entities.

*Third*, both M&K ES and M&K Sales exercised centralized control over labor relations. Importantly, Meyering and Pilecki, both of whom served as officers of M&K Sales, were key figures in labor negotiations between M&K ES and the Union. PDSUMF ¶ 53. Meyering negotiated "economics" (i.e., wages and benefits) affecting the M&K Sales locations and Meyering had final authority to approve collective bargaining agreements. PSUMF ¶ 88; DPSUMF ¶ 88; DSUMF ¶ 54; PDSUMF ¶ 54. Moreover, all M&K ES employees were subject to M&K Sales employee handbooks and contractual agreements with original equipment manufacturers. PSUMF ¶¶ 70–71, 79; DPSUMF ¶¶ 70–71, 79. And Meyering and Pilecki were responsible for approving and hiring general managers who in turn were responsible for interviewing and hiring subordinate M&K ES employees. PSUMF ¶¶ 68, 83; DPSUMF ¶¶ 68, 83. Pilecki was kept apprised of all day-to-day hiring and firing decisions by the M&K ES entities' director of human resources. PSUMF ¶ 87; DPSUMF ¶ 87. These facts are sufficient to establish centralized control over labor relations.

*Fourth*, there was common ownership between M&K ES and M&K Sales. Formally common ownership is not required for the Court to find in favor of the Trustees on this factor. *See Shopman's Loc. Union 502 Pension Fund v. Samuel Grossi & Sons, Inc.*, 578 F. Supp. 3d 698,

708 (E.D. Pa. 2022). Nor is it required that the entities be owned by members of the same family. *Id.* It suffices that the same people—Meyering and his subordinate officers—had control over both entities and that M&K ES and M&K Sales lacked an arms-length relationship. *See id.* To be clear about the relevant facts, M&K ES was owned and controlled by an officer of M&K Sales, Jansma, and later, Boucher; Jansma and Boucher both reported to Meyering, who directly or indirectly owned each M&K Sales entity. PSUMF ¶¶ 37, 48, 53, 81; DPSUMF ¶¶ 37, 48, 53, 81; DSUMF ¶ 27. M&K ES in turn received all of its revenue from M&K Sales. PSUMF ¶ 57; DPSUMF ¶ 57. These facts are sufficient to establish common ownership.

Having considered these four factors, the Court finds that each M&K ES entity constituted a single employer with its corresponding M&K Sales entity. As a result, each M&K Sales entity is jointly and severally liable with its corresponding M&K ES entity.

### (ii) Alter Ego Status

For largely the same reasons stated by the Court under its single employer analysis, the Court concludes that each M&K Sales entity constituted an alter ego of its corresponding M&K ES entity.

To determine alter ego status, the Court must consider "the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers," as well as "any transactions or other dealings between the two entities." *Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004) (citing *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998)). "[A]nti-union animus is not essential" but is relevant to the analysis. *Id.* A finding of single employer status is not required before concluding that two employers constituted alter-egos. *Favia Elec.*, 995 F.2d at 789.

The Court's detailed analysis of the entities' single employer status already decisively establishes the ownership, management, operations, and equipment factors of the alter-ego test in favor of Trustees. *See R.C. Tile*, 353 F.3d at 959–60. The Court will not repeat itself unnecessarily. Instead, the Court will additionally find that both entities shared the same customers and the same business purpose. M&K ES employees were leased exclusively to M&K Sales and operated the M&K Sales dealerships *in toto*. *See* PSUMF ¶¶ 55, 58; DPSUMF ¶¶ 55, 58. Hence, there is no question that they served all the same customers. And although defendants ascribe distinct business purposes to M&K ES and M&K Sales, both entities in reality shared the common purpose of operating truck dealerships. *Contra* DSUMF ¶¶ 57–58. All M&K ES employees spent all their working hours operating M&K Sales dealerships. PSUMF ¶¶ 55, 58, 73; DPSUMF ¶¶ 55, 58, 73. M&K ES was exclusively compensated for operating M&K Sales dealerships. PSUMF ¶ 57; DPSUMF ¶ 57. M&K Sales's attempt to distinguish its business purpose from that of M&K ES relies on the credulity-straining fiction that M&K ES's purpose was merely to lease employees. But the record screams a different story: M&K ES's purpose was to operate dealerships owned by M&K Sales on behalf of M&K Sales.

The Court also finds that anti-union animus was evident in the illusorily fragmented structure of the M&K organization. M&K constructed a vast artifice of limited liability entities in an attempt to insulate itself from liability to the Fund. Despite their formal separation, the undisputed facts establish that the M&K entities functioned as an integrated business enterprise. At every step relevant to this litigation, defendants have farcically strained to maintain the illusion of separation despite the obvious underlying reality. The Court is through with this fantasy. Each M&K Sales entity is jointly and severally liable with its corresponding M&K ES entity as an alter-ego or single employer.

4.  **Counts VII & VIII: Laborforce and M&K ESI Are Jointly and Severally Liable as Successors to the M&K ES Entities**

Trustees claim that Laborforce and M&K ESI are successors to the M&K ES entities and therefore are jointly and severally liable for outstanding withdrawal liability and delinquent contributions. Pls.' MSJ at 50–54. Specifically, Trustees claim that: (1) Laborforce is a successor to M&K ES Alsip and M&K ES Summit; and (2) M&K ESI is a successor to M&K ES Joliet and M&K ES Northern Illinois. *Id.* Trustees ask the Court to grant them summary judgment on this claim. *Id.* at 50. Laborforce and M&K ESI oppose. Laborforce's Opp'n at 5; M&K ESI's Opp'n at 5.

   (i)  **Laborforce**

"[A] successor can be held liable for its predecessor's withdrawal liability when the successor (1) 'substantially assumes the predecessor's assets,' (2) 'continues the predecessor's operations without interruption or substantial change,' and (3) had notice of the predecessor's withdrawal liability at the time the successor acquired the predecessor's assets." *IAM I*, 2021 WL 1546947, at *6 (quoting *Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.* ("*ManWeb II*"), 884 F.3d 770, 776 (7th Cir. 2018)). Laborforce concedes that the first two elements applied to M&K ES Alsip and M&K ES Summit and disputes only whether Laborforce had notice of the withdrawal liability. *See* Laborforce's Opp'n at 5–11. Laborforce's concession is sensible. The evidence overwhelmingly establishes that Laborforce substantially assumed M&K ES Alsip's and M&K ES Summit's assets and continued the operations of those entities without interruption or substantial change. *See, e.g.*, PSUMF ¶¶ 121–31; DPSUMF ¶¶ 121–31.

But Laborforce also loses on the notice issue. Jansma, Laborforce's sole owner, testified that she was not personally aware of the withdrawal liability assessment against M&K ES Alsip. Laborforce's Opp'n at 5; PSUMF ¶ 123; DPSUMF ¶ 123. However, Jansma, who owned M&K

ES Alsip and M&K ES Summit for several years, signed the M&K ES Alsip CBA, the M&K ES Summit CBA, and the Laborforce CBA. PSUMF ¶¶ 62, 80–81, 124–25; DPSUMF ¶¶ 62, 80–81, 124–25; DSUMF ¶ 16. These CBAs were substantially similar to each other and applied to largely the same set of employees. *See* PSUMF ¶¶ 62, 124–25, 131; DPSUMF ¶¶ 62, 124–25, 131. Jansma apparently understood the legal significance of these agreements as pertains to withdrawal liability and delinquent contributions. For example, she believed that the Laborforce CBA, unlike the M&K ES Alsip and M&K ES Summit CBAs, created "no risk" of withdrawal liability. PSUMF ¶ 132; DPSUMF ¶ 132. Importantly, these CBAs actually resulted in withdrawal liability and delinquent contribution obligations for these two entities, as the Court has now held. These developments could not have come as a surprise to Jansma. Indeed, she *should* have known of them, both because she signed the CBAs and was familiar with their terms—including the M&K ES Summit CBA term that the Court has now held reaches covered work performed at M&K Sales Northern Illinois—and because it was public information that the Fund was underfunded at the time that she hired employees from M&K ES. PSUMF ¶ 12; DPSUMF ¶ 12.

Laborforce argues that constructive notice may not be imputed because Jansma (and Laborforce) did not engage in due diligence when they acquired the assets of M&K ES Summit and M&K ES Alsip. Laborforce's Opp'n at 8–9. But formal due diligence is not required where the acquirer previously *owned* the companies whose assets were acquired, was *signatory* to the CBAs under which the companies whose assets were acquired incurred withdrawal and delinquent contributions liability, and, at the time of the acquisition, *served alongside or under the owner* of the acquired assets (i.e., Boucher) as an officer of the same functionally integrated business enterprise (i.e., M&K). *See* PSUMF ¶¶ 44–48, 53, 62, 80–81, 124–25; DPSUMF ¶¶ 44–48, 53, 62, 80–81, 124–25; DSUMF ¶ 16. The Court will not require the type of formal due diligence that

typically accompanies arm's length transactions when the entire structure of the M&K organization would have rendered such due diligence an empty, performative formalism. And the Court believes it entirely supported by law to impute notice to Jansma given that she and Boucher both served under Meyering, who participated in negotiations over the CBAs, had authority to approve or reject them, and was worried about the threat of withdrawal liability to the viability of his companies. PSUMF ¶¶ 48, 88, 114; DPSUMF ¶¶ 48, 88, 114; DSUMF ¶ 54; PDSUMF ¶ 54; *see also* Meyering Dep. at 46–47.

The Court concludes that these facts establish as a matter of law that Jansma (and therefore Laborforce) had constructive notice of the withdrawal liability. *See IAM I*, 2021 WL 1546947, at *6 (citing *Tsareff v. ManWeb Services, Inc.* ("*ManWeb I*"), 794 F.3d 841, 847 (7th Cir. 2015)); *see also Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990); *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995); *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 847–48 (9th Cir. 2018). Laborforce is jointly and severally liable for the outstanding withdrawal liability and delinquent contributions as successor to M&K ES Alsip and M&K ES Summit.

### (ii) M&K ESI

M&K ESI does not contest that it satisfies the test for successor liability as applied to M&K ES Joliet and M&K ES Northern Illinois. *See* M&K ESI's Opp'n at 7–16. Again, this concession is sensible because M&K ESI cannot credibly challenge any elements of the successor liability test as applied to these two M&K ES entities. *See, e.g.*, PSUMF ¶¶ 133–38; DPSUMF ¶¶ 133–38. Rather, M&K ESI argues that it cannot be held jointly and severally liable for the outstanding

withdrawal liability because it is not a successor to the specific entity against which withdrawal liability was assessed—M&K ES Alsip. M&K ESI's Opp'n at 7–16.

The Court finds this argument unconvincing. The Court has determined that M&K ES Joliet and M&K ES Northern Illinois are trades or businesses under common control with M&K ES Alsip. That means M&K ES Joliet and M&K ES Northern Illinois are jointly and severally liable for the debts of M&K ES Alsip. 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-2(c). Uncontestably, M&K ESI is jointly and severally liable for the debts of M&K ES Joliet and M&K ES Northern Illinois as their successor. *See* PSUMF ¶¶ 133–38; DPSUMF ¶¶ 133–38; M&K ESI's Opp'n at 7–16. Therefore, M&K ESI is also jointly and severally liable for the debts of M&K ES Alsip, including outstanding withdrawal liability. This result is equitable under the circumstances of this case, which the Court has now expounded at length. And contrary to M&K ESI's representations, the Court has never adopted the position that liability may only run against the successor to M&K ES Alsip. *IAM I*, 2021 WL 1546947, at *6; *contra* M&K ESI's Opp'n at 4.

Hence, M&K ESI is jointly and severally liable for the outstanding withdrawal liability and delinquent contributions as successor to M&K ES Joliet and M&K ES Northern Illinois.

### 5. Count X: Chad and Jodi Boucher Are Jointly and Severally Liable with M&K ES Alsip

Trustees claim that Chad and Jodi Boucher are personally liable for M&K ES Alsip's outstanding withdrawal liability, interest, and liquidated damages, because they operated an unincorporated "home flipping" trade or business under common control with M&K ES Alsip. Pls.' MSJ at 35–38. Trustees ask the Court to grant them summary judgment on this claim. *Id.* at 38. The Bouchers oppose and seek a ruling that they are not personally liable. Bouchers' MSJ at 12–22; Bouchers' Opp'n at 8–18.

"[C]ontrolling shareholders and corporate officers are not employers and therefore may not be personally liable for a company's withdrawal liability." *Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 n.3 (7th Cir. 2001). However, "Congress enacted § 1301(b) in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Id.* at 644 (quoting *Bd. of Trs. of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987)). Section 1301(b)(1) in turn provides that "all . . . trades or businesses (whether or not incorporated) which are under common control shall be treated . . . as a single employer." 29 U.S.C. § 1301(b)(1). As a result, any business "under common control is jointly and severally liable for the withdrawal liability of the others." *White*, 258 F.3d at 640.

The Bouchers have owned M&K ES Alsip since the end of 2014. PSUMF ¶¶ 81–82; DPSUMF ¶¶ 81–82. After acquiring M&K ES Alsip, the Bouchers began buying, renovating, and selling homes. PSUMF ¶ 21; DPSUMF ¶ 21. The only question is whether these activities constituted a trade or business. If they constituted a trade or business, then the Bouchers are jointly and severally liable for the debts of M&K ES Alsip because that trade or business was under common control with the M&K ES entities. *See* 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.1563-1(a)(3)(ii); *see also Incoal*, 995 F.2d at 251 n.8.

An activity constitutes a trade or business if the person engaged in it with "continuity and regularity" for the "primary purpose" of generating "income or profit." *Incoal*, 995 F.2d at 250–51 & n.7 (quoting *Commissioner v. Groetzinger*, 480 U.S. 23, 35–36 (1987)). "A sporadic activity, a hobby, or an amusement diversion does not qualify" as a trade or business. *Id.* at 250. Whether an activity constitutes a trade or business is a question of fact. *Id.* at 251. Relevant considerations include whether: the defendants intended to generate profits; reported income or deducted

expenses on their tax returns; invested substantial financial resources into the activity; invested substantial time into the activity; and, when the activity involves real property, invested substantial time into the specific kinds of activities that are characteristic of managing real property as a business, as opposed to a passive investment. *See id.* at 253–54; *Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, LLC*, 421 F. Supp. 2d 71, 76–77 (D.D.C. 2006); *see also Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 878–79 (7th Cir. 2011); *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895–96 (7th Cir. 2001).

The undisputed facts establish that the Bouchers' practice of buying, renovating, and selling homes exhibits each of these characteristics and was for the primary purpose of generating income or profit. Therefore, the Court concludes that the Bouchers' "home flipping" operation was a trade or business under common control with M&K ES Alsip.

*First*, the Bouchers bought homes in their own names using their personal funds and then renovated and resold them. PSUMF ¶ 23; DPSUMF ¶ 23. The Bouchers hoped to earn profits on these sales. Chad Boucher Dep. B at 20–21; Jodi Boucher Dep. at 5, 11. Additionally, Chad Boucher gave testimony in which he affirmed that he and his wife's activities constituted a "business." Chad Boucher Dep. B at 20–21.

The Bouchers attempt to explain away these admissions by characterizing the relevant testimony as "counsel's leading questions," rather than defendants' answers. Bouchers' Opp'n at 12–14. The fact that the questions were leading takes the Bouchers nowhere. *See* Fed. R. Evid. 611; Fed. R. Civ. P. 32(d)(3)(B). But more importantly, it is clear that Chad Boucher's answers constituted affirmations. When asked about his role in the "business," Chad Boucher referred to his activities with his wife as an "operation." Chad Boucher Dep. B at 20. When asked when the "house-flipping business" started, he responded, without qualification, "2018." *Id.* And

mere moments later, he testified that he and his wife "hopefully sold [the homes] for a profit." *Id.* at 21. Jodi also testified that she did not want to lose money on the homes, and that if she did so, she would have stopped buying and renovating. Jodi Boucher Dep. at 11. This factually undisputed testimony establishes the Bouchers' intent to earn profits. *See Incoal*, 995 F.2d at 251. The Bouchers' attempt to recharacterize this testimony as reflecting only Jodi Boucher's commitment to her "hobby" does not alter the import of this evidence.

*Second*, the Bouchers reported the gains from their home flipping operation on their 2017 tax return. BSUMF ¶ 33; PBSUMF ¶ 33. Although they reported these gains under the schedule for "Short-Term Capital Gains and Losses," and not the schedule for "Profit or Loss from Business," this fact supports a finding that the activity constituted a trade or business, although it does not weigh as heavily as it would have had the Bouchers also deducted their expenses. *See KBB*, 421 F. Supp. 2d at 75–76.

*Third*, the Bouchers invested substantial personal resources into buying, renovating, and reselling homes. The Bouchers spent $426,500 of their own funds to acquire four homes that they renovated and resold between 2017 and the end of 2018. PSUMF ¶¶ 28–31; DPSUMF ¶¶ 28–31. Jodi spent nearly *every day* on-site at the renovated properties making improvements. PASUMF ¶ 63; BPASUMF ¶ 63. And her activities within the operation were all-encompassing and exhaustive. Jodi found the properties and negotiated their sale, decided which renovations to make, retained contractors, conducted demolition, personally oversaw the contractors, and paid contractors and suppliers. PSUMF ¶ 25; DPSUMF ¶ 25. Chad also performed landscaping services on the properties, reconciled costs, and prepared and filed the Bouchers' joint tax returns. PSUMF ¶ 26; DPSUMF ¶ 26. These investments of time and money were undoubtedly substantial. And

they were characteristic of managing real property as a business, and not merely as an investment. *See KBB*, 421 F. Supp. 2d at 77; *Fulkerson*, 238 F.3d at 896; *SCOFBP*, 668 F.3d at 878–79.

There was nothing passive about the Bouchers' home-flipping activities. They did not earn income merely by holding properties that they rented and in which they invested minimal time and personal resources. *Cf. White*, 258 F.3d at 644. Here, the Bouchers spent nearly every day on-site at their real properties engaging in both administrative and hands-on physical work in the hopes that their work would be realized as profits. PASUMF ¶ 63; BPASUMF ¶ 63; PSUMF ¶¶ 25–26; DPSUMF ¶¶ 25–26. The Court commends the Bouchers for deriving pleasure and fulfillment from this work. But the mere fact that this work concerned real estate—and was psychologically valuable—does not change its fundamental, uncontested nature: intensive activity, repeated daily for nearly two years, spanning the entire home renovation process from beginning to end, and involving several properties and hundreds of thousands of dollars in upfront investment. The end goal of all of these activities was to earn a profit. And the Bouchers engaged in these activities as partners. *See* Chad Boucher Dep. B at 20–21. That renders the Bouchers' home-flipping operation a trade or business within the meaning of *Incoal*. *See* 995 F.2d at 250–51 & n.7.

Public policy concerns cannot rescue the Bouchers. *See id.* at 251 n.8. The Court's role is to determine whether the Bouchers' operation constituted a trade or business. *Id.* It did. The Court will not alter its analysis simply because it is not transparently obvious that M&K ES (which the Bouchers own) dissipated its assets via the Bouchers' home-flipping operation. The Court has already made clear that M&K was, in every practical sense, a singular organization. And the Bouchers themselves insist that they transferred one of their properties to M&K ES Main for $1.00 just three days before M&K ES Alsip's withdrawal date. PASUMF ¶ 52; BPASUMF ¶ 52. If the

Bouchers had kept their personal home-flipping operation at arm's length from M&K, then perhaps the Court would take pause. But the evidence indicates that they did exactly the opposite.

Additionally, the Court finds that although the Bouchers transferred their last personally purchased property to M&K ES Main on December 28, 2018, that does not mean that their home-flipping business had come to an end. PASUMF ¶ 52; BPASUMF ¶ 52. The Court has already made clear that it finds this transfer exceedingly curious. Simply put, the Bouchers' home-flipping business did not conclude merely because they transferred a property that they were actively renovating to *another business entity that they personally owned*. PSUMF ¶ 82; DPSUMF ¶ 82. Additionally, even if the Bouchers did not transfer the property to an entity that they owned, or did so at arm's length, their home-flipping business still would not have come to an end. The Bouchers' operation did not consist only of renovating properties actually owned. It also encompassed identifying homes to renovate. PSUMF ¶ 25; DPSUMF ¶ 25. So, the business's temporal boundaries were not co-extensive only with ownership of properties actively undergoing renovations.

And the Bouchers did not finish renovating homes at the end of 2018. PASUMF ¶¶ 53–60; BPASUMF ¶¶ 53–60. In fact, they continued. Chad Boucher established CJKA for exactly this purpose, and the Bouchers' renovation activities under this entity continued through at least August 2021. PASUMF ¶¶ 54, 56–60; BPASUMF ¶¶ 54, 56–60. By 2020, Jodi Boucher was reporting on her tax return that her occupation was "home remodeling," and the Bouchers were now utilizing the schedule for "Profit or Loss from Business" to report profits. PASUMF ¶¶ 55, 68; BPASUMF ¶¶ 55, 68. So, the legal structure of the Bouchers' operation changed, even as the underlying business remained the same. To be clear, the Court does not rely on the Bouchers' conduct under the auspices of CJKA to find them jointly and severally liable, but these facts are

helpful because they contextualize the Bouchers' pre-2019 conduct as that befitting a business. And they help to show that the mere fact that the Bouchers transferred their home days before withdrawal does not mean that their business was at an end.

In summary, the Court finds that the Bouchers were engaged in the business of buying, renovating, and reselling homes. The Bouchers conducted this business as partners and held it under common control with M&K ES Alsip as of the December 31, 2018 withdrawal date. The Court acknowledges that this result will be disappointing to the Bouchers. But it is the risk they took when they carried on an unincorporated business while simultaneously owning and operating an entity subject to a CBA that came to owe withdrawal liability upon complete withdrawal from the Fund. The Trustees are entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** M&K ES Main's motion for leave to correct their responses to the Trustees' fourth set of requests for admissions; **DENY** M&K ES's motion to clarify or reconsider this Court's February 28, 2022 opinion, *IAM II*, which denied the defendants' earlier motion for partial summary judgment; **GRANT** the Trustees' motion for summary judgment on Counts I, II, III, IV, VI, VII, VIII, and X; and **DENY** M&K ES's and the Bouchers' cross-motions for summary judgment on Counts I, II, III, and X.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: September 18 2023

Royce C. Lamberth
United States District Judge