**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRUSTEES of the IAM NATIONAL PENSION FUND**, | |
| *Plaintiff,* | |
| **v.** | Case No. 1:20-CV-433-RCL |
| **M&K EMPLOYEE SOLUTIONS, LLC**, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

The Trustees of the IAM National Pension Fund ("IAM"), plaintiffs in this long-running ERISA dispute, and their counsel Proskauer Rose LLP ("Proskauer") have been engaged in a multi-year long battle to extract overdue withdrawal liability, delinquent contributions, and other damages from the defendants, entities and natural persons associated with a network of truck dealerships and service stations (collectively, "M&K").  All throughout, M&K has tried to hide behind a Potemkin corporate structure in a credulity-straining campaign to convince the court that it is judgment-proof.  M&K has also failed on multiple occasions to comply with discovery obligations and express orders of this Court, incurring sanctions as a result.

Over the course of nearly five years, IAM's counsel undertook a herculean effort to overcome M&K's obduracy and unwind its web of legal defenses, eventually culminating in a grant of summary judgment for their clients.  They garnered a tremendous recovery of more than $15 million for IAM, and racked up a considerable quantity of billable hours and out-of-pocket costs in the process.  Those fees and costs are the subject of this opinion.

Before the Court today is IAM's Motion for Attorneys' Fees and Costs, which M&K vehemently opposes as excessive.  M&K's objections are almost entirely unpersuasive.  For the reasons contained herein, the Court will **GRANT IN PART AND DENY IN PART** IAM's motion, and will reduce their proposed fee award by approximately 1%.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This Court has recounted the factual, procedural, and statutory circumstances underlying this dispute in several previous opinions.  *See Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC* ("*IAM IV*"), 694 F. Supp. 3d 54 (D.D.C. 2023); *Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC* ("*IAM III*"), No. 21-cv-2152-RCL, 2022 WL 4534998 (D.D.C. Sept. 28, 2022); *Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC* ("*IAM II*"), No. 20-cv-433-RCL, 2022 WL 594539 (D.D.C. Feb. 28, 2022); *Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC* ("*IAM I*"), No. 20-cv-433-RCL, 2021 WL 1546947 (D.D.C. Apr. 20, 2021).  The Court will therefore presume some familiarity with the facts, and restate only the most relevant information.

"To ensure that employees who were promised a pension would actually receive it, Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA")."  *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 734 (D.C. Cir. 2022).  Shortly after ERISA's passage, it became clear that the statute provided inadequate protections for a particular type of pension plan: the multiemployer pension plan ("MPP"), which is "maintained pursuant to a collective bargaining agreement between multiple employers and a union."  *Id.*; 29 U.S.C. § 1002(37)(A).  MPPs are particularly important in "industries where there are hundreds or thousands of small employers going in and out of business and where the nexus of the employment relationship is the union that represents employees who typically work for many of those employers over the course of their career."  *United Mine Workers*, 39 F.4th at 734 n.1.  Under ERISA, employers were generally able to withdraw from MPPs without any financial

obligation to continue supporting the plan, even though their employees retained the benefits that they had accrued, putting immense financial pressure on the pension funds. *Id.* at 734–35 & n.2.

In 1980, Congress enacted the Multiemployer Pension Plan Amendments Act ("MPPAA"), codified at 29 U.S.C. §§ 1381–1461, to "protect the financial solvency of multiemployer pension plans." *Bay Area Laundry and Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997). It does so by "requir[ing] most employers who withdraw from underfunded multiemployer pension plans to pay 'withdrawal liability.'" *Id.* (quoting 29 U.S.C. § 1381(a)). Withdrawal liability is assessed as "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381, 1391). The MPP's trustees are responsible for calculating an employer's withdrawal liability and setting a payment schedule for the employer to follow, which is meant to "approximate[] the periodic contributions the employer had made before withdrawing from the plan." *Bay Area Laundry*, 522 U.S. at 196–97 (citing 29 U.S.C. §§ 1399(b)(1), (c)(1)(C)).

An employer may dispute an assessment of withdrawal liability by first requesting reconsideration by the fund, then submitting the dispute to arbitration. *Id.* at 197 (citing 29 U.S.C. §§ 1399(b)(2), 1401(a)(1)). However, even if it disputes the amount due, the employer must abide by the payment schedule, a protocol commonly referred to as the "'pay now, dispute later' collection procedure." *Id.* (citing *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 800 F.2d 641, 642 (7th Cir. 1986)). The pay now, dispute later procedure ensures that employers cannot litigate abusively to delay payment of their withdrawal liability until, say, the MPP or the employer becomes insolvent. *IAM II*, 2022 WL 594539, at *2 (collecting cases). The MPPAA contains

built-in enforcement mechanisms to enforce compliance with the pay now, dispute later procedure: if an employer fails to comply, the MPP may accelerate the unpaid withdrawal liability (i.e., abandon the payment schedule and demand payment all at once instead), seek judicial intervention, and force the employer to pay attorneys' fees, liquidated damages, and other costs associated with litigation. *Bay Area Laundry*, 522 U.S. at 197; *see* 29 U.S.C. §§ 1399(c)(5), 1451(a)(1), 1451(b), 1451(e). The liquidated damages are owed whether or not the employer's challenge to the plan's withdrawal liability assessment is meritorious: they are a "penalty for refusing to follow" the pay now, dispute later procedure, "separate from the underlying withdrawal liability itself." *IAM II*, 2022 WL 594539, at *2 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Lady Balt. Foods, Inc.*, 960 F.2d 1339, 1347 (7th Cir. 1992)).

The IAM National Pension Fund is an MPP associated with the International Association of Machinists and Aerospace Workers, AFL-CIO union. Compl. ¶ 17, ECF No. 1. The defendants (collectively, "M&K") are a collection of truck dealerships and service centers with a complex corporate structure. The business was structured as a group of "sales entities," which performed the business of selling and servicing trucks and trailers, and corresponding "Employment Solutions entities" (or "ES entities"), which hired employees and leased them to the sales entities. *IAM IV*, 694 F. Supp. 3d at 70–71. Thus, the sales entities formally had no employees; all of their operations were performed by employees leased to them by the ES entities. *Id.* at 71. The companies were also linked by overlapping ownership and control structures, shared usage of facilities and equipment, mutual contractual obligations, the same legal representation, accounting, and banking services, and a shared registration address. *Id.* at 72–76.

Three of the M&K ES entities were parties to collective bargaining agreements that required them to remit payment to IAM. *Id.* at 78. They each withdrew from their collective

bargaining agreements between 2017 and 2018.  *Id.*  In January 2019, IAM engaged Proskauer to advise them on how to proceed against M&K.  *See* Pl.'s Billing Summ. 1, Mot. for Att'y Fees and Costs Ex. 1, ECF No. 196-2.  In June 2019, IAM notified the ES entity located in Alsip, IL ("M&K ES Alsip") that it would be assessed over $6 million in withdrawal liability, due in quarterly installments beginning in August 2019.  *IAM IV*, 694 F. Supp. 3d. at 80.  M&K ES Alsip requested a reconsideration of that assessment, which was denied in September 2019.  *Id.*  M&K ES Alsip commenced arbitration in November 2019, but did not fulfill either of its first two quarterly payment obligations.  *Id.*  This led IAM's trustees to initiate the instant lawsuit in February 2020. *Id.*; *see generally* Compl.

The ensuing litigation has been fraught and complicated.  Initially, IAM sought and received a preliminary injunction ordering M&K to pay the first two quarterly installment payments that M&K had missed, which totaled about $700,000 before liquidated damages, interest, and attorneys' fees and costs.  Order of Mar. 19, 2020, ECF No. 22.  M&K responded, asserting that it was "financially unable to make any payment to the Trustees."  *IAM IV*, 694 F. Supp. 3d at 80; M&K Unable to Pay Letter 2, Declaration of Neil V. Shah, Associate at Proskauer Rose, Ex. 2, Pls.' Mot. for Summ. J., ECF No. 160-21.  As a result, IAM accelerated M&K's withdrawal liability in September 2020.  Faced with a large sum to collect and a defendant claiming inability to pay, IAM amended their complaint several times to join the M&K sales entities as defendants and assert various theories of secondary liability against them, then to join two newly formed employment entities called Laborforce and M&K ESI, and then to join Chad and Jodi Boucher, the owners of M&K ES Alsip.  *IAM IV*, 694 F. Supp. 3d at 81–82.

It would be excessive, in view of this Court's numerous other opinions in this dispute, to recount every twist and turn in this dispute.  But other select highlights include a second

preliminary injunction ordering M&K to pay the full amount of its withdrawal liability, with which—like the first preliminary injunction—M&K failed to comply, *id.* at 81; an arbitration award that ordered IAM to recalculate the withdrawal liability in a manner favorable to M&K, which this Court later vacated, *see generally IAM III*, 2022 WL 4534998; and two successful motions to compel the defendants to comply with IAM's discovery requests and depositions, one of which resulted in sanctions against the defendants and their attorneys. *IAM II*, 2022 WL 594539, at *12–13 (granting the first motion to compel and approving sanctions); *see also* Order of May 27, 2022, ECF No. 136 (granting in part the second motion to compel).

In September 2023, three years and seven months after IAM filed its complaint, the Court granted summary judgment for IAM, holding that M&K ES Alsip and the other ES entities were liable to IAM for unpaid withdrawal liability, delinquent contributions, interest, and liquidated damages. *IAM IV*, 694 F. Supp. 3d at 89–101. The Court further held that each M&K sales entity was jointly and severally liable for the withdrawal liability and delinquent contributions of its corresponding ES entity, *id.* at 102–04; that Laborforce and M&K ESI were also jointly and severally liable for the outstanding withdrawal liability and delinquent contributions as successors to the M&K ES entities, *id.* at 104–06; and that Chad and Jodi Boucher were jointly and severally liable for M&K ES Alsip's outstanding withdrawal liability, interest, and liquidated damages, *id.* at 106–09. The Court awarded IAM a total of $15,497,860.50. Suppl. Shah Decl. ¶ 3, Pl.'s Reply Attach. 1, ECF No. 214.

Much of the complexity of this case, and the prodigious sweat equity accrued by the lawyers who worked on it, could have been spared but for the recalcitrance of the defendants and their counsel. As the Court noted in *IAM IV*:

> [A]nti-union animus was evident in the illusorily fragmented structure of the M&K organization. M&K constructed a vast artifice of limited liability entities in an

attempt to insulate itself from liability to [IAM].  Despite their formal separation, the undisputed facts establish that the M&K entities functioned as an integrated business enterprise.  At every step relevant to this litigation, defendants have farcically strained to maintain the illusion of separation despite the obvious underlying reality.  The Court is through with this fantasy.

*IAM IV*, 694 F. Supp. 3d. at 104.  Now before the Court is IAM's motion for attorneys' fees, in which it requests $2,461,113.63[1] in attorneys' fees and $173,578.62 in costs.  Mot. for Att'y Fees and Costs, ECF No. 196; Shah Decl. ¶ 6, Mot. for Att'y Fees and Costs Attach. 1, ECF No. 196-1.  The defendants have filed a response to this motion, arguing for various reasons that this award should be reduced by at least 60%.  Defs.' Opp'n, ECF No. 212.  IAM has filed a reply, which both addresses the defendants' opposition and requests an additional $119,116.80 in attorneys' fees and costs.  Pl.'s Reply, ECF No. 214.  The defendants have filed a surreply.  Defs.' Surreply, ECF No. 216. The motion is now ripe for this Court's review.

## III.   LEGAL STANDARDS

"ERISA provides that, in actions to collect unpaid contributions in which the plan is successful, the court 'shall award to the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant."  *Bd. of Trs. of Hotel and Rest. Emps. Loc. 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998).  The parties do not dispute that "[t]he usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee," also known as the "lodestar" method.  *Id.*; *see* Defs.' Opp'n at 2; Pl.'s Reply at 1.  Indeed, the Supreme Court has held that in fee shifting cases, the lodestar method is favored.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (describing lodestar as "the guiding light of our fee-shifting jurisprudence") (quoting *City of Burlington v. Dague*, 505 U.S.

---

[1] IAM initially requested attorneys' fees $439 higher than the amount represented in this paragraph.  In its reply, IAM adjusted its fee request downward by this amount in response to the defendants' observation that it had mistakenly included a time entry that was not compensable because it referred to work on a related arbitral proceeding.

557, 562 (1992)).  "The fee applicant bears the burden of establishing all elements of the requested fee award, including entitlement to the award, documentation of appropriate hours, and justification for the reasonableness of the rates." *McClam v. Dist. of Columbia*, 808 F. Supp. 2d 184, 188 (D.D.C. 2011) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).  However, once the applicant has met this burden, the non-moving party must rebut the applicant's showing with "equally specific countervailing evidence." *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982)).  It follows from *Covington* that a court need not countenance speculative or overbroad assaults on how the fee applicant went about its work.

The lodestar method is not as formulaic as it may appear at first blush.  The Court must first determine what hourly rate is "reasonable," an analysis which "turns on three sub-elements: (1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Eley v. Dist. of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (quoting *Covington*, 57 F.3d at 1107).  In assessing the reasonableness of the applicant's rates, two reference points are commonly used.  First, "[i]n this Circuit, 'an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services . . . .'" *Miller v. Holzmann,* 575 F. Supp. 2d 2, 11–12 (D.D.C. 2008) (quoting *Kattan ex rel. Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993)).  This is so because "[t]here is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay." *Cobell v. Norton*, 231 F. Supp. 2d 295, 302–03 (D.D.C. 2002) (quoting *Griffin v. Wash. Convention Ctr.*, 172 F. Supp. 2d 193, 197 (D.D.C. 2001)).  Second, courts in this district frequently check the applicant's requested rates against the *Laffey* Matrix, a rate schedule developed by the United

States Attorney's Office for the District of Columbia which "track[s] prevailing attorney's hourly rates for complex federal litigation in the District of Columbia" based on a lawyer's years of experience. *See McClam* 808 F. Supp. 2d at 189.

The Court must also determine whether the hours claimed by the applicant were reasonably expended. For example, a court may discount an applicant's fee request for hours spent pursuing losing arguments, but will usually do so only where the losing claims were unrelated to the plaintiff's successful claims or where the end result for the plaintiff is poor. *See Merrick v. Dist. of Columbia*, 316 F. Supp. 3d 498, 506 (D.D.C. 2018) ("Courts . . . have the discretion to reduce attorneys' fees awards to account for partial or limited success on the merits by either eliminating specific hours or reducing the award as a whole.") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436–37 (1983)); *Radtke v. Caschetta*, 254 F. Supp. 3d 163, 175 (D.D.C. 2017) ("Fees may be reduced for time spent on ultimately unsuccessful claims, but those claims generally must be both unsuccessful and unrelated to the successful claims.") (citing *Hensley*, 461 U.S. at 434–35). A court may also discount hours where the plaintiff's billing documentation is not descriptive or granular enough for the Court to determine whether the hours were well-spent, such as where a fee applicant lumps a "laundry list of activities" under a "single total hour figure," a practice known as "block billing." *Williams v. Johnson*, 174 F. Supp. 3d 336, 349 (D.D.C. 2016); *see also Spanski Enters., Inc. v. Telewizja Polska S.A.*, 278 F. Supp. 3d 210, 220 (D.D.C. 2017) ("Block billing is not forbidden, but where it prevents the court from assessing the reasonableness of time expended, it has caused courts to reduce fee awards."). Courts must also reject claims for "'excessive, redundant, or otherwise unnecessary' charges," *Okla. Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1347 (D.C. Cir. 1991) (quoting *Hensley*, 461 U.S. at 434), such as where the fee applicant spends substantially more time on a task than its complexity warrants or attempts to recover for

duplicative work.  Finally, purely administrative tasks are more properly construed as costs of doing business, and are therefore non-compensable as part of an attorneys' fees award.  *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 601 F. Supp. 2d 45, 52 (D.D.C. 2009) (holding that tasks which "'ought to be considered part of normal administrative overhead,'" such as "the copying and storage of pleadings, updating the qualifications of various attorneys . . . and making copies and tabs are not compensable") (quoting *Michigan v. EPA*, 254 F.3d 1087, 1095–96 (D.C. Cir. 2001)), *vacated in part on other grounds*, 608 F.3d 871 (D.C. Cir. 2010).

## IV.   ANALYSIS

### A.  The Plaintiff's Requested Rates Are Reasonable

For each hour billed in this litigation, the plaintiffs seek a fee equal to the lesser of Proskauer's hourly rates and the rates prescribed by the *Laffey* Matrix.  Shah Decl. ¶ 8.  The defendants do not disagree in principle that a rate selected according to this method is reasonable. However, IAM argues that the Court should award fees based on the lesser of the *most recent* rate Proskauer actually charged to the fund and the *current version* of the *Laffey* Matrix, *id.*, whereas the defendants argue that the fee should be based on the lesser of these rates at the *time that the work was performed*.  Defs.' Opp'n 5–6.  The Court agrees with IAM that the use of current rates is appropriate here.

"[T]o roughly compensate for delay in payment, a district court has the authority to award current market rates instead of historic market rates . . . ."  *Covington v. Dist. of Columbia*, 839 F. Supp. 894, 902 (D.D.C. 1993), *aff'd*, 57 F.3d 1101 (D.C. Cir. 1995).  When deciding whether to use current or historical rates, courts consider "the party at fault for the delay . . . the length of the delay between the time the services were rendered and the time of payment," and whether the use of current rates would "create a windfall for plaintiffs' counsel."  *Radtke*, 254 F. Supp. 3d at 181–82 (collecting cases).

As to the first two factors, this litigation dragged on for far longer than it ought to have, in large part due to the defendants' contumacy and intractability. The duration of more than three and a half years between the complaint and final judgment is well within the range that has led other courts in this district to apply current rates. *See Brackett v. Mayorkas*, No. 17-cv-988-JEB, 2023 WL 5094872, at *6 (D.D.C. Aug. 9, 2023) (Boasberg, C.J.) (collecting cases lasting two-to-three years). This litigation could have concluded much sooner and with less fanfare, in which case the use of current rates may have been improper. But the defendants sealed their own fate by forcing IAM to unravel their phantasmagoria of corporate entities rather than simply paying their dues; willfully flouting the pay now, dispute later scheme provided by the MPPAA; openly disobeying this Court's preliminary injunctions; and obstinately resisting the plaintiff's meritorious discovery efforts. The Court is unmoved by the defendants' attempt to positively recast this conduct as "zealous litigation," Defs.' Opp'n 6, and even if it were, "[a defendant] cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980).

As to the third factor, the defendants argue that using current rates would produce a windfall for the plaintiffs: IAM's retroactive application of current rates yields a fee request of $2,461,552.63[2] which, according to the defendants, exceeds the amount Proskauer *actually* billed IAM by $370,394.80. *See* Defs.' Opp'n 4. Assuming the defendants are correct, this would represent a "windfall" of about 18%. But the Court need not decide whether an 18% windfall would be too extravagant in this case. That is because, even if the Court were to side with the defendants and order a recalculation of the fee award based on historic rates, the Court would

---

[2] This sum reflects the original amount requested in IAM's motion for attorneys' fees, before the $439 deduction mentioned above. For purposes of calculating the "windfall percentage" from the use of current rates, this $439 difference is trivial.

nevertheless adjust that award upward based on interest and inflation to make the plaintiff whole for the foregone time-value of money, as it has discretion to do. *See In re LivingSocial Mktg. and Sales Prac. Litig.*, 298 F.R.D. 1, 21 (D.D.C. 2013).  Indeed, one reason that courts in this District may use current rather than historical rates in fee calculations is as a "surrogate for . . . interest or other inflation adjustments." *Bishopp v. Dist. of Columbia*, No. 83-cv-0417-JHG, 1994 WL 398834, at *3 (D.D.C. July 12, 1994).  Thus, the windfall of which the defendants warn is necessarily overstated.[3]

While the Court has not undertaken a hypothetical recalculation of the fee award based on historic rates and adjusted for the time-value of money, it is confident that whatever windfall may result from the use of current rates is outweighed by the unnecessary length of this litigation, driven predominantly by the defense.  Therefore, the Court will apply current rates, as IAM proposes.[4]

## B.  The Hours Expended by Plaintiff's Counsel Were Reasonable

The defendants next argue that Proskauer spent far too many hours litigating this dispute and that their supporting documentation is deficient in various ways.  None of the defendants' arguments have merit.

### (i)  The Defendants' Comparisons to Other ERISA Cases Are Inapt

The defendants first contend that the fees requested in this dispute are out of line with the usual ERISA case, noting a handful of examples with fees ranging from $19,000 to $170,000.  Defs.' Opp'n 8.  But these cases are hardly analogous because they do not approximate the

---

[3] Furthermore, considering the high-interest rate, high-inflation economic environment that prevailed during much of this litigation, the defendants' alleged windfall is likely overstated by quite a bit.

[4] Defendants argue that IAM shares some of the blame for the length of this litigation, pointing in particular to IAM's Fifth Amended Complaint, ECF No. 143, which added thirty-six additional defendants who were eventually voluntarily dismissed.  Notice of Voluntary Dismissal, ECF No. 154.  But there is simply no comparison between the entirety of the defendants' dilatory tactics and this brief episode, which lasted less than two months and had no effect on the briefing schedule.  *See* Order Denying Motion to Modify the Scheduling Order, ECF No. 153.

complexity and scale of the suit at hand, as IAM points out.  Pl.'s Reply 18; *see Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, No. 17-cv-1657-CKK, 2019 WL 2870216, at *1 (D.D.C. July 3, 2019) (awarding roughly $19,000 in fees on a roughly $34,000 judgment involving no withdrawal liability or secondary liability theories); *Boland v. Ace Masonry, Inc.*, No. 12-cv-1375-TSC/RMM, 2020 WL 13093653, at *1 (D.D.C. Nov. 24, 2020) (awarding roughly $81,000 in fees on a roughly $610,000 judgment involving no withdrawal liability); *Int'l Painters and Allied Trades Indus. Pension Fund v. I Losch Inc.*, No. BPG-19-3492, 2023 WL 24247, at *1 (D. Md. Jan. 3, 2023) (awarding roughly $115,000 in fees on a roughly $160,000 judgment).

More to the point, IAM has provided the Court with a facially reasonable accounting of its time spent on this lawsuit, so the burden now rests on the defendants to rebut their showing with "equally specific countervailing evidence." *Covington*, 57 F.3d at 1109.  The defendants cannot meet that burden merely by gesturing indignantly at other assorted ERISA cases, with no exploration of the—potentially very different—factual and legal circumstances underlying those disputes.  Rather, they must engage with the substance of IAM's billing documentation and point to deficiencies that are particular and perceptible.  As the following sections illustrate, their attempts to do so are mostly unavailing.

### *(ii) Proskauer's Block-Billing Is Too Insignificant to Warrant a Fee Reduction*

First, the defendants argue that Proskauer "block-billed" by lumping together various discrete tasks within single time entries, making it impossible for the Court to determine how much time was spent on each task and whether that allocation of time was reasonable.  Defs.' Opp'n 10–11.  The defendants claim to have identified 353 block entries, identified by the presence of a semi-colon, and provide a citation to eight of them that exceeded seven hours of time.  Vogel Decl. ¶¶ 8–

9, Defs.' Opp'n Ex.1, ECF No. 212-1.  But the defendants cite no authority, and this Court knows of none, for the proposition that any time entry containing a semi-colon is necessarily block-billed. Therefore, the Court will examine the sample of allegedly block-billed entries that the defendants cite in detail.

Some of the alleged block-billed entries do not evince block-billing at all.  For example, entries 436 and 744 reflect an attorney performing multiple tasks—research, writing, and/or conferring with their colleagues—with respect to the same document.  Pl.'s Unredacted Billing Summ. 30, 51, Sealed Mot. for Att'y Fees and Costs Ex. 1, ECF No. 197-1.  These entries do not qualify as block-billing because the tasks are so closely interrelated as to constitute the same activity for compensation purposes.  Most lawyers will agree that it is commonplace to conduct research and write in tandem; it would be unrealistic to require attorneys to note the time whenever they flip between a draft memorandum and Westlaw.  Likewise, conferring with colleagues about a work in progress can be an integral part of the drafting process, and may take place so casually as to not constitute a break in the drafting process.  Others entries, such as entry 2,916, reflect the performance of very similar functions—e.g. "[r]eview legal citations," "review record citations," and "review exhibits cited" —across multiple documents that were filed together.  Pl.'s Unredacted Billing Summ. 203.  If this description instead attested simply to "proofreading" those documents, there would be no dispute as to its propriety, and the Court will not penalize Proskauer or IAM for time entries that go beyond the requisite level of specificity.

Admittedly, a handful of the entries identified by the defendant are clear-cut examples of block-billing.  For example, entries 703, 1,064, and 2,896 clearly reflect the same task performed across different unrelated documents, or different tasks altogether.  Pl.'s Unredacted Billing Summ. 48, 75, 202.  Nevertheless, the Court will not reduce the fee award on account of these few

isolated errors.  "Block billing is most troublesome" where the fee applicant has "prevailed only 'on a portion of their claims,'" and where the block billing is so "extensive" as to "interfere[] with the Court's ability to evaluate the reasonableness of billed hours spent on specific motions or filings."  *Hernandez v. Chipotle Mexican Grill*, 257 F. Supp. 3d 100, 111–12 (D.D.C. 2017) (Howell, C.J.) (citing *DL v. Dist. of Columbia*, 256 F.R.D. 239, 245 (D.D.C. 2009)).  Neither circumstance is present here.  Proskauer largely prevailed on virtually every major motion in the course of this litigation, including the ultimate summary judgment motion, the preliminary injunction and discovery motions, and various defendants' motions to dismiss or for partial summary judgment.  And it would be an unreasonable extrapolation for the Court to find, based on the small handful of block-billed entries identified by the defendant, a pattern of block-billing so "extensive" as to obfuscate how counsel spent their time.  While Proskauer would do well to guard against block-billing in the future, the "relatively small fraction of [block-billed] entries," viewed in context, does not "call into question the overall reasonableness of the request . . . ."  *Fitts v. Unum Life Ins. Co. of Am.*, 680 F. Supp. 2d 38, 42–43 (D.D.C. 2010) (citing *Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 157–58 (D.D.C. 2006)); *see also Wye Oak Tech., Inc. v. Republic of Iraq*, 557 F. Supp. 3d 65, 90 (D.D.C. 2021) (declining to reduce a fee award due to block billing that was not "so systemic or egregious that the Court was unable to generally assess the reasonableness of the hours expended"); *Spanski Enters.*, 278 F. Supp. 3d at 220–21 ("Although some entries may have been . . . more crowded with tasks than others, the court is not of the view that these entries were so numerous and/or unintelligible as to preclude the court's ability to assess the reasonableness of the time expended.").

*(iii) Proskauer May Bill for Time Spent in Internal Conferences*

Next, the defendants argue that Proskauer spent significant time on "internal attorney conferences," which they claim are problematic for two reasons: first, because some of the conference entries are billed in blocks which also contain legal work, and second, because billing time for multiple attorneys participating in the same conference is impermissible double-counting of labor. The Court has already rejected the block-billing argument, and the double-counting argument is no more persuasive.

As a general matter, internal strategy conferences are compensable, and each participant's time may be counted toward the fee application. *See McKenzie v. Kennickell*, 645 F. Supp. 437, 450 (D.D.C. 1986) ("[C]onferences between attorneys to discuss strategy . . . are an essential part of effective litigation . . . and there is no reason or authority for allowing only one lawyer to charge for time that more than one lawyer justifiably spent."). Sometimes a firm overbills for these conferences to such a grave extent as to warrant a fee reduction, but this typically occurs only when a case is greatly overstaffed relative to its complexity, leading to strategy conferences that are overcrowded and unduly expensive. *See, e.g.*, *In re Olson* 884 F.2d 1415, 1429 (D.C. Cir. 1989) (admonishing a fee applicant for "engag[ing] in a plethora of conferences . . . consuming the time of several attorneys who bill at very high rates"); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 411 (D.D.C. 2015) (reducing a fee award in an overstaffed, "non-extraordinary FOIA case," where the applicant's time sheets were "replete with conferences among co-counsel attempting to coordinate case strategy"). By contrast, in this highly complex, multi-year, multi-defendant dispute, a large majority of the work was performed by just two associate attorneys. Shah Decl. ¶ 9. The Court is satisfied that their leanly staffed strategy sessions did not unduly run up the tab in their representation of IAM.

*(iv) Billing Large Time Blocks Is Permissible*

The defendants next challenge as "suspect" a group of twenty-two time entries, each of which is at least eight hours long and purports to reflect work on a single task. Defs.' Opp'n 12–15. This argument is easily dispensed with. As is common knowledge, attorneys are no strangers to long hours, and work far in excess of a typical eight-hour workday is standard fare. Courts in this District have accordingly rejected challenges to fee applications based on the bare number of hours worked in a day. *See, e.g.*, *Salazar v. Dist. of Columbia*, No. 93-cv-452-GK, 2014 WL 12695696, at *9 (D.D.C. Jan. 30, 2014) (rejecting a challenge based on time entries in excess of eight hours); *Lewis v. Dist. of Columbia Gov't*, No. 15-cv-521-JEB, 2018 WL 6308722, at *13 (D.D.C. Dec. 3, 2018) (rejecting a challenge based on a 14-hour day billed by trial attorneys). And it would be absurd to require that, if an attorney works on a single task for longer than eight hours, he must nevertheless break up that time entry into shorter chunks for the sake of appearances.

The Court does not rule out the possibility that exceptionally long blocks of hours could pique the Court's suspicion, for instance, if those hours were dedicated to a task that could not reasonably take so long, or if a single attorney consistently reported exceptionally arduous hours over a very long period of time. But merely pointing to a scattered handful of lengthy time entries accrued over the course of multiple years of litigation, as the defendants have done, is not enough to raise eyebrows.

*(v) Proskauer Properly Billed for Time Spent Litigating Against the Defendants Named in the Fifth Amended Complaint*

As noted above, IAM's Fifth Amended Complaint added thirty-six co-defendants who were voluntarily dismissed less than two months later. The defendants argue that it was improper

for Proskauer to bill for time spent pursuing claims against these defendants.  Defs.' Opp'n 15–16.  The Court disagrees.

The defendants rely on *Anthony v. Sullivan* for the proposition that "no fee may be granted for work done on claims on which the party did not prevail . . . ."  *Anthony v. Sullivan*, 982 F.2d 586, 589 (D.C. Cir. 1993).  The defendants conveniently omit the remainder of that sentence from *Anthony*, which reads "unless the unsuccessful claims were submitted as alternative grounds for a successful outcome that the plaintiff did actually achieve."  *Id.*  The *Anthony* court in turn relied on *Hensley*, which clarifies the contours of this principle: "In some cases a plaintiff may present in one lawsuit *distinctly different* claims for relief that are based on *different facts and legal theories*.  In such a suit . . . work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved,'" and is therefore non-compensable.  *Hensley*, 461 U.S. at 434–35 (emphasis added) (quoting *Davis v. Cnty. of Los Angeles*, No. 73-63-WPG, 1974 WL 180, at *3 (C.D. Cal. June 5, 1974)).

With this added context from *Anthony* and *Hensley*, it becomes clear that IAM's claims against the thirty-six ultimately non-suited defendants are not the type of unsuccessful collateral claims against which those cases warn.  In its Motion for Leave to File the Fifth Amended Complaint, IAM stated that the additional thirty-six prospective defendants were members of the M&K control group, some or all of whom IAM believed to be jointly and severally liable for the defendants' withdrawal liability based on information gleaned from depositions.  ECF No. 140.  In other words, IAM's claims against these defendants were predicated on precisely the same facts and legal theories as against the pre-existing defendants, as permitted by *Anthony* and *Hensley*.  What's more, IAM had good reason to believe that it could press the same legal theories against the thirty-six new defendants as against the previously named ones, given the defendants' practice

of seeking cover behind makeshift corporate facades. Therefore, adding these additional defendants was an entirely reasonable and properly compensable pursuit, even if it was ultimately fruitless.

It is significant as well that the defendants did not oppose the motion for leave to file the Fifth Amended Complaint. If the defendants believed that the plaintiffs were unduly expanding the scope of the litigation, they could and should have made their position clear at the time, rather than waiting until it came time to award attorneys' fees to air their grievances.

Finally, and at least as importantly, the Fifth Amended Complaint also added Chad and Jodi Boucher as party-defendants. *See* Fifth Amended Complaint, ECF No. 143. These two were not voluntarily dismissed alongside the other thirty-six defendants added in the Fifth Amended Complaint, and the Court eventually granted summary judgment for IAM in its claims against them. *IAM IV*, 694 F. Supp. 3d at 106. "Where, as here, a 'plaintiff has obtained excellent results' . . . the award 'should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.'" *Miller*, 575 F. Supp. 2d at 33 (quoting *Hensley*, 461 U.S. at 435).

In sum, the defendants cannot argue that IAM's time spent pursuing legal action against various M&K control group entities and persons was time wasted when 1) the facts and theories of the case, as well as the defendants' own conduct, suggested the need for this course of action, 2) the defendants failed to oppose it in the moment, and 3) the plaintiff's course of action was ultimately—if only partially—successful. The fact that the Court authorized IAM to file the Fifth Amended Complaint, *see* Order of June 21, 2022, ECF No. 142, and that the thirty-six defendants were voluntarily dismissed relatively swiftly with no effect on the briefing schedule, further buttresses the Court's conclusion that no fee reduction is warranted.

(vi) *Proskauer's Bills for e-Filing Are Excessive, but Time Spent Calendaring Deadlines Is Compensable*

The defendants next argue that Proskauer improperly billed at an attorney rate for time spent e-filing papers, as well as computing litigation deadlines and placing them on calendars. The defendant is partially correct: e-filing cannot be billed at attorney rates, but calendaring is properly the domain of an attorney.

In *Role Models America, Inc. v. Brownlee*, the D.C. Circuit reduced a fee award where the applicant billed at attorney rates for time spent filings briefs. *See Role Models Am. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004) (citing *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989)). This Court agrees that an attorney cannot be compensated for e-filing unless the exercise involves some application of legal expertise. *Cf. Hernandez*, 257 F. Supp. 3d at 110 (declining to reduce a fee award containing time entries for filing where the filing work was coupled with lawyerly tasks such as drafting and editing). However, courts in this District have permitted the recovery of paralegal fees for time spent on filing papers and other comparable tasks. *See, e.g.*, *Open Cmtys All. v. Carson*, No. 17-cv-2192-BAH, 2018 WL 8622230, at *4 (D.D.C. June 15, 2018) (Howell, C.J.) (noting that there is no controlling authority holding that filing is a non-compensable "clerical" task); *Dickens v. Friendship-Edison P.C.S.*, 724 F. Supp. 2d 113, 124 (D.D.C. 2010) (permitting recovery of paralegal fees, but rejecting attorney time entries, for "time spent on tasks such as filing pleadings").

The defendants allege that Proskauer billed 36.5 hours for entries containing the word "e-file," of which 13.5 were billed at an attorney rate of $640 / hour. Vogel Decl. ¶ 15. IAM argues

in vain that e-filing is compensable at attorney rates,[5] but does not contest the defendants' characterization of those entries, which the Court therefore treats as conceded.  The Court will therefore void the 13.5 attorney hours spent on e-filing and reduce the final recovery by $8,640, but leave the remainder of the e-filing entries, billed at proper rates, intact.

The defendants also argue that the 13.5 hours spent by Proskauer attorneys on computing and calendaring deadlines are not compensable.  But unlike e-filing, calendaring litigation deadlines is not a perfunctory or administrative undertaking; it is a high-stakes task requiring the interpretation of procedural rules and statutes, and it is therefore reasonable for attorneys to perform it and be paid for doing so.  *See Cohen v. Bd. of Trs. of Univ. of Columbia*, 305 F.R.D. 10, 14 (D.D.C. 2014) ("All counsel have an obligation to monitor the court's docket and keep apprised of relevant deadlines") (quotation omitted), *rev'd in part on other grounds*, 819 F.3d 476 (D.C. Cir. 2016).  The Court will not reduce the fee award for these entries.

*(vii) Proskauer Properly Billed for Time Spent Writing and Reviewing Emails*

Defendants challenge a large number of entries, totaling a cumulative 164.125 hours, which contain the term "[e]mails with."  Vogel Decl. ¶ 16.  The defendants do not argue that the emails in question were unrelated to the substance of this litigation, but object on the grounds that it is impossible to determine whether the entries reflect writing or reviewing emails, and that permitting recovery for both drafting and reading emails would constitute impermissible double-billing.  Defs.' Opp'n 17.  Neither rationale is persuasive.

First, it does not matter whether the entries reflected time spent drafting emails, reading emails, or some combination of the two, because these tasks are two equally compensable sides of

---

[5] The only case that IAM cites directly in support of this position is *Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 915 (D.D.C. 1993).  This case was decided before the D.C. Circuit's opinion in *Role Models*, so the Court will adopt the position prevalent in this District's more recent case law, such as *Open Communities* and *Dickens*.

the same coin.  *See Petties v. Dist. of Columbia*, No. 95-cv-0148-PLF, 2009 WL 8663462, at *8 (D.D.C. 2009) (holding that courts may order reimbursement for time to "exchange emails to discuss . . . issues and to strategize," which helps "'ensure that a case is managed in an effective as well as efficient manner'") (citing *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1337); *see also Woodland v. Viacom*, 255 F.R.D. 278, 284 (D.D.C. 2008) (holding that emails are compensable where they are in furtherance of proper litigation task, such as upcoming "motions or hearings").  Emails can achieve none of these purposes, of course, unless they are both written and read.

The defendants' second argument, that only one lawyer should be able to bill for each email, is flawed for the same reason as their already-rejected argument that only one lawyer should be able to bill for each internal strategy meeting.  "Sending and reading emails," like internal strategy meetings, are "necessary parts of litigating a claim."  *Urb. Air Initiative, Inc. v. EPA*, 442 F. Supp. 3d 301, 326 (D.D.C. 2020).  Emails help drive litigation forward by ensuring that each participant is in possession of the same information and has an opportunity to contribute to the discussion.  To state the obvious, these ends are only served if each participant actually reads the emails sent to them.  Just as each internal conference participant may bill for their time in conference, so may each email participant bill for their time spent drafting or reading messages.[6]

*(viii) The Defendants Have Failed to Identify Duplicative Billing Entries*

The defendants next claim that Proskauer billed for duplicative entries.  However, they point to only a single pair of entries that they believe to be duplicative: entries 2,040 and 3,544,

---

[6] As with internal strategy conferences, if too many attorneys spend excessive time exchanging emails over relatively uncomplicated matters, this wasteful conduct may justify a fee reduction.  *See, e.g.*, *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 197 F. Supp. 3d 290, 295–96 (D.D.C. 2016) (reducing a fee application in a "fairly straightforward" FOIA case where "[a]lmost every page of the bill is replete with two-, three-, four- or (sometimes) five-attorney . . . e-mails").  But that is not the case in this highly complex and leanly staffed matter.

both of which were for research concerning attorneys' fees based on rates exceeding the *Laffey* Matrix. Pl.'s Unredacted Billing Summ. 144, 251. The Court will not reduce the fee award on this basis. First, pointing to a sole allegedly duplicative entry worth $874—less than 0.04% of the total fees at stake in this litigation—borders on the "picayune." *Elec. Priv. Info Ctr.*, 197 F. Supp. 3d at 295 (declining to strike a line-item entry that represented a "0.06% markdown of [the plaintiff's] total proposed bill"). But more importantly, as IAM explains in its reply, the latter entry simply represented a continuation of the research reflected in the former entry. Pl.'s Reply 16. There is no rule against one lawyer picking up where another left off. The Court will not second-guess the plaintiff's fee award documentation on the basis of an isolated duplicative entry for which the plaintiffs have advanced a plausibly innocuous explanation.

In sum, apart from the handful of hours spent e-filing papers at attorney rates, the defendants have not met their burden to specifically demonstrate any unreasonable expenditure of time by plaintiff's counsel. Accordingly, the Court will deduct the time spent on e-filing from the final fee award but will not apply the wholesale reduction of IAM's fee application that the defendants urge.

### C. Proskauer's Costs Are Reasonable

In addition to fees, IAM also seeks to recoup various litigation costs, originally[7] totaling $173,578.62, that were billed to it by Proskauer. Mot. for Att'y Fees and Costs 13. Of these, the defendants only contest the legal research costs passed on by plaintiff's counsel, which originally

---

[7] As already discussed, in addition to the costs incurred in the main course of litigation, IAM also seeks additional costs incurred in the drafting of its reply brief. This section concerns only the costs incurred during the main course of litigation. The Court separately examines the additional costs requested in the reply brief below. "Originally," as used in this section, refers to the costs incurred before October 16, 2023.

totaled $113,396.30.[8]  Defs.' Opp'n 18–19.  The defendants argue that IAM has not provided the Court with evidence to justify such a large legal research bill.

However, defendants cite to no authority—and the Court knows of none—requiring a plaintiff who prevails in litigation pursuant to a fee-shifting statute to provide a detailed account of its legal research expenses.  Rather, the usual practice is for the plaintiff to recoup the costs actually billed, *see e.g. Role Models*, 353 F.3d at 975, unless the court can "articulat[e] some good reason for" reducing the costs awarded.  *Baez v. U.S. Dep't of Just.*, 684 F.2d 999, 1004 (D.C. Cir. 1982).  And although a six-figure legal research expenditure may seem eyepopping at first, it represents only about 4% of the total sum which IAM originally sought to recoup in this action.  Courts in this Circuit have approved reimbursements for legal research expenses that are proportionally far greater.  *See, e.g.*, *Role Models*, 353 F.3d at 975 (awarding $83,000 in fees and costs, of which Westlaw fees constituted roughly 11%).  Absent any articulable reason to doubt the propriety of Proskauer's legal research costs, or any other costs accrued in the course of litigation, the Court will award them in full.

### D.  Post-Judgment Interest Shall Be Calculated as of October 4, 2023

There is no dispute that IAM is entitled to post-judgment interest on its award of attorneys' fees and costs.  *See* 29 U.S.C. § 1961(a).  "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of judgment."  *Id.*  The parties disagree, however, as to what constitutes the "date of judgment," which will determine both the date on which the interest begins to accrue and the rate at which it accrues.

---

[8] IAM's other costs include CourtAlert and PacerPro fees, court reporter fees, outsourced document services, printing, shipping, filing fees, and costs associated with service of process.  Mot. for Att'y Fees and Costs 13–14.  These costs are not in dispute.

The defendants argue that the "date of judgment," for purposes of 29 U.S.C. § 1961(a), is the date on which the fee award is quantified—in other words, the date this opinion issues.  Defs.' Opp'n 19–20.  The defendants' stance is consistent with the position taken by the Third and Tenth Circuits.  *See Eaves v. Cnty. of Cape May*, 239 F.3d 527, 527–28 (3d Cir. 2001); *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson / Am. Express, Inc.*, 962 F.2d 1470, 1476–77 (10th Cir. 1992). However, as IAM notes, every other Circuit to consider the issue has held that interest runs from the date of the judgment "which unconditionally entitles the prevailing party to reasonable attorney fees," rather than the date on which those fees are calculated.  *Assoc. Gen. Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 493–495 (6th Cir. 2001) (collecting cases from the Fifth, Eighth, Ninth, Eleventh, and Federal Circuits endorsing this view).  At least two courts in this District have adopted the majority rule expressed in *Drabik* as well.  *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 282 F. Supp. 3d 203, 215–16 (D.D.C. 2017) (Berman Jackson, J.); *Boehner v. McDermott*, 541 F. Supp. 2d 310, 321–24 (D.D.C. 2008) (Hogan, C.J.) (also noting district courts in the First and Second Circuits that have adopted the majority rule).

This Court will adopt the majority rule espoused by IAM.  The entire purpose of awarding post-judgment interest to a prevailing litigant is to compensate them for the time-value of the funds to which they are entitled as a result of their victory.  An attorneys' fee award may be quantified days after the decision entitling the party to judgment or, as in this case, the issue may be hotly litigated and take over a year to reach resolution.  The minority rule, therefore, subjects the victorious litigant's award to contingent variables wholly unrelated to the merits of the dispute,

such as how quickly the parties brief their fee award dispute and how long the Court takes to resolve it. This Court will not endorse such a rule.[9]

However, that does not end the matter: there is the further question of when exactly IAM became "unconditionally entitle[d]" to an award of attorneys' fees. According to IAM, that date is September 18, 2023, the date on which the Court granted summary judgment for IAM. Mot. for Att'y Fees and Costs 14. But the defendants argue that this date is instead October 4, 2023, the date on which the Court docketed its judgment in favor of IAM and awarded damages. Defs.' Opp'n 21; *See* Judgment, ECF No. 194.

On this score, the Court agrees with the defendants, for three reasons. First, it is consistent with the way that other courts in this District have handled this very issue. For example, in *Boehner*, the court held that post-judgment interest would accrue from October 22, 2004, the date on which the court ordered the payment of damages, rather than the date on which the court granted partial summary judgment for the plaintiff, which was about two months earlier. *See Boehner*, 541 F. Supp. 2d at 320–21; *see also* Memorandum Opinion, *Boehner v. McDermott*, No. 98-cv-594-TFH (D.D.C. Oct. 22, 2004), ECF No. 82 (calculating and awarding damages). Likewise, in *Baylor*, the court held that interest would accrue beginning on February 28, 2014, the date on which the Clerk entered judgment for the plaintiff, rather than on the date that the plaintiff accepted the defendant's Rule 68 offer of judgment approximately three weeks earlier. *Baylor*, 282 F. Supp. 3d at 215–16. Second, the Supreme Court's decision in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, which held that post-judgment interest should run from the date of judgment rather than

---

[9] The defendants also argue that the minority rule is appropriate in this case because IAM is asking for compensation at current rates rather than actual billed rates, so awarding post-judgment interest for the pendency of the attorneys' fees dispute is, in effect, paying them interest twice. This argument is meritless: the retroactive rate adjustments apply only to hours accrued *before* September 18, 2023, when the Court granted summary judgment for IAM. By contrast, the post-judgment interest which the plaintiffs seek would cover the period *between* judgment and the time that the fee award is actually paid. There is no overlap and, therefore, no duplication of interest.

the date of verdict, supports the defendant's position by analogy. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990). And finally, the defendants' interpretation is more consistent with the language of the statute, which provides for post-judgment interest on "*money* judgment[s] . . . ." 28 U.S.C. § 1961(a) (emphasis added). It is more consonant with the statutory text for interest to begin accruing on the date of the judgment which announces the *money* to which the victorious party is entitled, rather than the grant of summary judgment which may contain no reference to money at all.

Accordingly, the Court will award post-judgment interest beginning on October 4, 2023, the date on which the Court entered judgment for IAM. The interest will be calculated based on a rate of 5.44%, the weekly average 1-year constant maturity Treasury Yield published by the Board of Governors of the Federal Reserve for the week ending on October 6, 2023.[10]

### E. The Additional Fee Request for Proskauer's Reply Brief Will Be Discounted Slightly

In its reply brief, IAM requests an additional $104,926.25 in attorneys' fees and $14,190.55 in costs for work performed since October 16, 2023. Pl.'s Reply 20–21; Suppl. Shah Decl. ¶ 10. A scan of the accompanying billing documentation shows that a significant minority of these costs were incurred in the two days leading up to filing the motion for attorneys' fees, whereas the majority are attributable to work on the reply brief itself. *See generally* Suppl. Billing Summ., Suppl. Shah Decl. Ex. 6, ECF No. 213-3. The defendants argue that this cost is "patently excessive" for work which mostly culminated in a single reply brief, and points to the same alleged deficiencies in IAM's supplemental billing documentation that supposedly plagued its original motion for attorneys' fees. *See generally* Defs.' Surreply. It would be redundant to reiterate why

---

[10] *See* Bd. of Governors of the Fed. Rsrv., Data Download Program, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

the defendants' attacks on Proskauer's individual time entries, which repeat the same flawed theories that the Court has already rejected above, fall flat here.

However, the Court agrees that the expenses associated with the reply brief are excessive, if only slightly. The roughly two months of work for which IAM now seeks to recover represent about 3.4% of the total time between when IAM first engaged Proskauer in January 2019 and when the reply brief was filed in December 2023. The fees and costs for those two months represent about 4.3% of the total pre-interest sum now sought by IAM. Comparing these figures, it is clear that the latest fee request is disproportionately expensive, although not inordinately so.[11] And it is true, as the defendants point out, that the sum IAM requests for just two months of work closely approximates or exceeds the *total* attorneys' fees awarded in some ERISA litigations. *See, e.g.*, *Int'l Painters*, 2023 WL 24247, at *1; *Boland*, 2020 WL 13093653, at *1.

However, the reply brief in question evinces a significant intellectual investment on Proskauer's behalf. For example, of the thirty-five opinions cited in the reply brief's table of authorities, fewer than ten appear in the original motion's table of authorities, demonstrating that Proskauer made a significant effort to digest and conscientiously respond to the defendants' opposition briefing. Proskauer performed work befitting a case of this complexity and magnitude, and went only slightly overboard in the time it took to do so.

"'[T]rial courts need not, and indeed should not, become green-eyeshade accountants' in examining fee requests since "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.'" *Elec. Priv. Info. Ctr. v. Nat'l Sec. Agency*, 87 F. Supp. 3d 223, 235

---

[11] If Proskauer accrued about 4.3% of its total expenses in 3.4% of the total time of the engagement, that implies that Proskauer's efforts during this period were between 25%–30% more expensive per unit of time than in the litigation at large. The Court is cognizant of the fact that the time-intensity of litigation naturally fluctuates over the course of a dispute, but would expect the periods of greatest intensity to be when the parties are in the throes of discovery, the briefing of dispositive motions, and the like, rather than in the construction of a reply brief related to a fee dispute. "A request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437.

(D.D.C. 2015) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).  Therefore, the Court need not void individual problematic entries, but instead "has the discretion to impose a reasonable percentage reduction to the petition as a whole."  *Cobell v. Jewell*, 234 F. Supp. 3d 126, 175–76 (D.D.C. 2017) (collecting cases).  Therefore, the Court will reduce IAM's supplemental fee request by a relatively modest 20% to bring its cost-per-unit-time into alignment with the rest of this dispute.  The Court will award IAM the full amount of costs requested, $14,190.55, so as not to deviate from the norm of awarding actual billed costs in full unless a good contrary reason appears.  But the Court will reduce the attorneys' fees request by $23,823.36—slightly more than 20% of what IAM has asked for—to achieve a net 20% reduction in the combined supplemental request.  Specifically, instead of the requested $104,926.25 in attorneys' fees, the Court will award $81,102.89, for a combined supplemental award of $95,293.44.

## V.   CONCLUSION

This opinion will finally bring to a close this dispute that took far more time and labor than it needed to.  All throughout, plaintiff's counsel showed admirable perseverance, creativity, and technical prowess in the face of the defendants' sometimes tenacious, but often dilatory and evasive, litigation strategies.  The Court will award attorneys' fees and costs as follows:

IAM's initial request sought $2,461,113.63 in attorneys' fees and $173,578.62 for costs. The Court will reduce the attorneys' fees award by $8,640 due to improper billing for e-filing, but will award the entire requested amount of costs.  Thus, for work completed prior to October 16, 2023, the Court will award $2,452,473.63 in attorneys' fees and $173,578.62 in costs.

IAM's supplemental request in its reply brief sought $104,926.25 in attorneys' fees and $14,190.55 for costs.  The Court will reduce the attorneys' fees award by $23,823.36, but award the entire requested amount of costs.  Thus, for work completed since October 16, 2023, the Court will award $81,102.89 in attorneys' fees and $14,190.55 in costs.

The total attorneys' fees award shall be $2,533,576.52, and the total costs award shall be $187,769.17, for a combined total award of $2,721,345.69. This award will be subject to post-judgment interest accruing at a rate of 5.44% beginning on October 4, 2023.

Date: September __30__, 2024

Royce C. Lamberth
United States District Judge